**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**HARBOR INSURANCE COMPANY, et al., Plaintiffs,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

Nos. 85 C 7080, 85 C 7081.

United States District Court, N.D. Illinois, E.D.

Sept. 8, 1986.

James Hiering, Dennis Waldon, Jeffrey Berkowitz, A. Benjamin Goldgar, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

Lowell Sachnoff, Barry Rosen, Carolyn Rosenberg Safer, Sachnoff, Weaver & Rubenstein, Chicago, Ill., for FDIC.

## MEMORANDUM OPINION AND ORDER [1]

SHADUR, District Judge.

Harbor Insurance Company ("Harbor"), Allstate Insurance Company ("Allstate") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") have sued Continental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank") and a host of other defendants, seeking to avoid liability under the

---

1. Because all this Court's opinions in these cases tend to begin with the same opening description, some means of early differentiation is use-ful. Solely for that purpose, it is noted this is this Court's ninth written opinion since the cases were reassigned to its calendar.

directors' and officers' ("D & O") policies (the "Policies") plaintiffs had issued to CIC. Counts I and II of each Complaint[2] ask for a declaratory judgment:

1. rescinding the respective Policies on the ground CIC's financial statements attached to the 1981 Policy renewal applications contained materially false information (Count I); and

2. excluding claims asserted in the underlying substantive litigation from Policy coverage on the ground the 1981 Policy renewal applications falsely asserted CIC's lack of knowledge as to circumstances likely to produce such claims (Count II).

Now Federal Deposit Insurance Company ("FDIC") has moved:

1. for an order under Fed.R.Civ.P. ("Rule") 26(f) limiting discovery as to Count I; and

2. for judgment on the pleadings under Rule 12(c) as to Count II.

For the reasons stated in this memorandum opinion and order, FDIC's motions are granted in full.

### Facts[3]

In the spring or summer of 1981 CIC decided to increase its D & O liability coverage from $40 to $100 million (NU ¶ 3; H–A ¶ 3). To that end, on July 9, 1981 CIC submitted a standard-form "RENEWAL PROPOSAL for DIRECTORS AND OFFICERS INSURANCE including COMPANY REIMBURSEMENT (FINANCIAL INSTITUTIONS)" (the "Form Renewal Proposal") to its insurance broker, Rollins Burdick

Hunter Co. ("Rollins") (NU Ex. A; H–A Ex. A).[4] In relevant part the Form Renewal Proposal (with CIC's responses indicated by italics) said:

6. Has the Company

\* \* \* \* \* \*

(b) filed or contemplated filing any registration statement with the Securities and Exchange Commission within the past 18 months or within the next twelve months for a public offering of securities (if so furnish a copy of prospectus).

*Yes, one. See copy of prospectus item attached.*

\* \* \* \* \* \*

11. It is agreed that this renewal proposal is a supplement to the proposal dated *June 30, 1978* and that proposal together with this renewal proposal constitute the complete proposal which shall be the basis of the policy and will be attached to and become part of the policy.

12. The undersigned authorized officer of the Company declares that to the best of his knowledge the statements set forth herein are true.

13. Attached and made part of this proposal by reference are two copies of our last Annual Report to Stockholders, two certified copies of the provisions of the Charter or By-Laws covering Indemnification of Directors and Officers and two copies of the Notice to Stockholders and the Proxy Statement for either the last or the next annual meeting. The

---

**2.** One Complaint is brought by National Union alone, while Harbor and Allstate are coplaintiffs in the other. For present purposes there is no material difference between the Complaints, and for brevity's sake this opinion will simply:

1. refer to "Count I" and "Count II," treating both Complaints as one, and

2. cite to the Complaints in the form "H–A ¶ —" or "H–A Ex.—" and "NU ¶ —" or "NU Ex.—."

**3.** Rule 12(c) principles require this Court to accept as true all well-pleaded facts alleged in the Complaints (*Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174, 177 n. 2 (7th Cir.1986)). FDIC's motions raise no mate-

rial factual disputes in any event: Their resolution turns on construction of the Policies and the Policy applications themselves.

**4.** On its face the Form Renewal Proposal does not show to whom it was submitted. However Harbor-Allstate-National Union Mem. 4 says the Form Renewal Proposal was given to Rollins for use in soliciting insurance bids. While that is a "matter outside the pleadings" in terms of the last sentence of Rule 12(c), it is mentioned here only to fill a gap in the narrative and has no material bearing on this opinion's conclusion. The the extent it does bear on the present issues, it cuts against Harbor-Allstate-National Union in any event, as the later text indicates.

Insurer is hereby authorized to make any investigation and inquiry in connection with this proposal as it may deem necessary.

Harbor (the contemplated primary D & O insurer) responded by sending its own proprietary "RENEWAL PROPOSAL FOR DIRECTORS' AND OFFICERS' LIABILITY INSURANCE" (the "Harbor Proposal"), which CIC filled out and submitted to Harbor August 18, 1981 (H–A Ex. B). In relevant part the Harbor Proposal (again with CIC's responses indicated by italics) said:

6. Has the Corporation:

\*    \*    \*    \*    \*    \*

(b) filed or contemplated filing any registration statement with the Securities and Exchange Commission within the past 18 months or within the next twelve months for a public offering of securities (if so furnish a copy of prospectus)

*Yes, one. See copy of prospectus attached.*

7.(a) Attach one copy of last Annual Report and latest Interim report.

(b) Attach one copy of Notice of Stockholders and the Proxy Statement for either the last or the next annual meeting.

(c) Attach one copy of Form 10K for latest fiscal year (applicable only to 12–g companies under the 1934 Securities and Exchange Act).

8. It is agreed that this renewal proposal is a supplement to the proposal dated *8/15/69* and that proposal together with this renewal proposal shall constitute the complete proposal which shall be the basis of any quotation which may be made.

9. The undersigned authorization [sic] officer of the Corporation declares that to the best of his knowledge the statements set forth herein are true.

On August 24, 1981 Harbor issued to CIC its D & O Policy covering the first $15 million of liability (H–A Ex. H).

National Union responded to the Form Proposal by sending its somewhat different proprietary "DIRECTORS AND OFFICERS LEGAL LIABILITY RENEWAL APPLICATION" (the "National Union Application"), which CIC filled out and submitted to National Union December 16, 1981 (NU Ex. B). In relevant part the National Union Application (also with CIC's responses indicated by italics) said:

6. Attach copies of the following:

*Previously provided*

(a) Latest annual report

(b) Latest interim financial statement available

(c) Latest 10–K report filed with the SEC (if the Company is publicly traded)

(d) Latest Dunn [sic] & Bradstreet Report

(e) If there has been a change, copy (Certified by Corporate Secretary) of the indemnification provision in the By Laws.

\*    \*    \*    \*    \*    \*

11. It is agreed that this renewal application is a supplement to the application completed on *February 27, 1976.* and that application together with this renewal supplement constitute the complete application that shall be the basis of the contract and will be attached to and form part of the policy.

12. It is agreed that the Corporation will file with National Union Fire Insurance Company of Pittsburgh, Pa., as soon as the same become available, a copy of each registration statement and annual or interim report which the Corporation may from time to time file with the Securities and Exchange Commission.

THE UNDERSIGNED AUTHORIZED OFFICER OF THE CORPORATION WARRANTS, AFTER INQUIRY, THAT TO THE BEST OF HIS KNOWLEDGE THE STATEMENTS SET FORTH IN THIS APPLICATION AND ALL OTHER APPLICATIONS PREVIOUSLY SUBMITTED ARE TRUE.

SIGNING OF THIS APPLICATION DOES NOT BIND THE UNDER-SIGNED TO COMPLETE THE INSUR-ANCE, BUT IT IS AGREED THAT THIS FORM AND ALL PREVIOUS AP-PLICATIONS SUPPLIED TO THE UN-DERWRITERS SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLI-CY BE ISSUED, AND IT WILL BE AT-TACHED TO THE POLICY.

On December 22, 1981 National Union issued two D & O Policies to CIC, one covering $25 million of liability over the first $25 million and the other covering $15 million of the next $50 million (NU Exs. G and H).[5] Both National Union Policies expressly state:

The Company agrees with the Insured named below, in consideration of the premium paid and subject to all the terms and conditions set forth below that the insurance afforded by this policy shall follow all the terms and conditions of Policy Number *To Be Advised* issued by The Harbor Insurance Company including all renewals and rewrites thereof.

Northbrook issued its Policy in early September 1981 (H–A Ex. I). Nothing of record indicates what application or proposal form or forms apply to that Policy.[6]

5. CIC's total $100 million D & O liability package was ultimately divided among five carriers as follows:
   1. Harbor (first $15 million);
   2. Northbrook Excess & Surplus Insurance Co. ("Northbrook") (next $10 million);
   3. National Union (next $25 million);
   4. Continental Casualty Co. ($25 million of the second $50 million):
   5. National Union ($15 million of the second $50 million); and
   6. New England Reinsurance Corporation ($10 million of the second $50 million).
   See H–A Ex. J, at 3. Allstate has succeeded to Northbrook's interests (H–A Preamble).

6. Indeed, in their current briefing neither FDIC nor Harbor-Allstate-National Union refers to the Northbrook Policy at all. H–A ¶ 100 suggests Northbrook simply dealt with Harbor, not directly with CIC.

7. H–A ¶ 40 refers to CIC's pending-litigation disclosure, but the Complaint does not include the Anderson Letter as an exhibit. Harbor-Allstate-National Union have submitted it on the present

Continental soon decided it needed still more D & O liability coverage, and on December 21, 1982 Harbor issued a further $5 million (the "1982 Policy") over and above the $100 million coverage then in force (H–A ¶ 40 and Ex. J). In the course of obtaining the 1982 Policy CIC Board Chairman Roger Anderson ("Anderson") disclosed, by letter to Harbor (the "Anderson Letter"), the existence of 10 then-pending suits against individual CIC officers or directors and stated (Harbor-Allstate-National Union Mem. Ex. A(8), at 3):[7]

To the knowledge of the undersigned no director or officer has any knowledge or information of any negligent act, error, omission, or breach of duty which he reasonably should expect could give rise to a claim against him.

*Count I: False Financial Statements*[8]

Count I claims CIC obtained the 1981 Policies through material misrepresentations and omissions as to CIC's and Bank's financial condition. FDIC says discovery as to the accuracy of any financial statements[9] CIC submitted with the Form Renewal Proposal, the Harbor Proposal and the National Union Application should be cut off because CIC never represented those financial statements were accurate.

motions, and FDIC does not challenge its authenticity. This opinion will treat with the Anderson Letter on the terms stated in n. 4.

8. At the outset, neither side has addressed the question what state's (or states') laws apply in this diversity action. Though both sides cite authorities from several jurisdictions, Illinois citations predominate. Unless the parties argue otherwise (and they have not), the forum state's substantive law controls (*National Association of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1284–85 (7th Cir.1985)). This Court will therefore—consistently with the litigants' approach—treat Illinois law as controlling here.

9. That term is used here in a generic sense to mean all 1980 financial statements, annual reports, Forms 10K, prospectuses and related materials CIC attached to the Form Renewal Proposal, the Harbor Proposal and the National Union Application.

Each of the Form Renewal Proposal, the Harbor Proposal and the National Union Application contains a representation of truthfulness:

[1.] The undersigned ... declares that to the best of his knowledge the statements set forth herein are true. [Form]

[2.] The undersigned ... declares that to the best of his knowledge the statements set forth herein are true. [Harbor]

[3.] THE UNDERSIGNED ... WARRANTS, AFTER INQUIRY, THAT TO THE BEST OF HIS KNOWLEDGE THE STATEMENTS SET FORTH IN THIS APPLICATION AND ALL OTHER APPLICATIONS PREVIOUSLY SUBMITTED ARE TRUE. [National Union]

FDIC says those representations in terms refer only to "statements set forth" in the forms themselves [10] and not to financial statements merely "attached" to them. Thus FDIC urges CIC represented or warranted the truth of the answers it gave to specific questions posed by the insurers in the forms, but it did not represent or warrant the truth of the documents it was requested to attach.

In the first place that is a matter of contract construction. FDIC of course points to the general rule ambiguities in insurance contracts are to be construed against the insurer, which had sole control of the contract's drafting and its contents and was in the best position to know what information, representations and warranties were needed to control its risks. *Playboy Enterprises, Inc. v. St. Paul Fire & Marine Insurance Co.*, 769 F.2d 425, 428 (7th Cir.1985) sets out the Illinois law in that respect:

However, if the policy language is ambiguous, a court will construe such ambiguity in favor of the insured since the insurer drafted the policy. *State Farm v. Moore*, 103 Ill.App.3d [250,] 255, 58 Ill.Dec. [609,] 614, 430 N.E.2d [641,] 646 [(2d Dist.1981)]; *Great Central Insurance Co. v. Bennett*, 40 Ill.App.3d 165, 171, 351 N.E.2d 582, 588 ([2d Dist.] 1976). This rule of strictly construing ambiguous provisions against the insurer is most rigorously applied in the case of ambiguous exclusionary provisions in which the insurer seeks to limit its liability. *State Farm v. Moore*, 103 Ill.App.3d at 255, 58 Ill.Dec. at 614, 430 N.E.2d at 646; *Dawe's Laboratories v. Commercial Insurance Co.*, 19 Ill.App.3d 1039, 1049, 313 N.E.2d 218, 225 ([1st Dist.] 1974). Thus, exclusionary provisions are applied to deny the insured coverage only where their terms are clear, definite, and explicit. *State Farm v. Moore*, 103 Ill. App.3d at 256, 58 Ill.Dec. at 614, 430 N.E.2d at 646.

See also *Strzelczyk v. State Farm Mutual Automobile Insurance Co.*, 138 Ill.App.3d 346, 349–50, 93 Ill.Dec. 20, 22–23, 485 N.E.2d 1230, 1232–33 (1st Dist.1985).

■ Of course that does not amount to an "insurance companies always lose" rule. But where insurers draft the requirements and exclusions in the absence of bargaining, it is proper they should gain no advantage from their own drafting ambiguities. On that score it is significant that the Form Renewal Proposal—obviously a generic form for industrywide use—*specifically* provided the attached financial statements were to be "made part of this proposal by reference," while the Harbor Proposal and National Union Application contained no such incorporating language. If the financial statements had been "made part of" a proposal, it would have done no violence to the language to hold a warranty or representation as to "statements set forth herein" would extend to those attachments. But neither Harbor nor National Union was satisfied with the Form Renewal Proposal. Each sent back its *own* form, and those lacked the incorporating language.

■ Nor is there any basis for the insurers claiming the benefit of the Form Renewal Proposal's language. Each of the Harbor Proposal and the National Union

---

**10.** As noted, each of the documents speaks of what is "set forth" either "herein" or "in this application and all other applications previously submitted."

Application stated it was a supplement to an earlier application (*not* to the Form Renewal Proposal) and (emphasis added):

[1.] that proposal together with *this* renewal proposal *shall constitute the complete proposal which shall be the basis of any quotation* which may be made. [Harbor]

[2.] that application together with *this* renewal supplement *constitute the complete application that shall be the basis of the contract* and will be attached to and form part of the policy.[11] [National Union]

That language completely excludes the possibility either Harbor or National Union intended the Form Renewal Proposal to constitute part of the ultimate insurance contracts.[12]

Review of elementary contract-law principles may be useful. Clearly the Form Renewal Proposal was an offer (*Metropolitan Life Ins. Co. v. Whitler*, 172 F.2d 631, 633 (7th Cir.1949); *Reynolds v. Guarantee Reserve Life Insurance Co.*, 44 Ill.App.3d 764, 767, 3 Ill.Dec. 397, 340, 358 N.E.2d 940, 943 (5th Dist.1976)).[13] Neither Harbor nor National Union responded by accepting that offer. Instead each sent its own form stating terms agreeable to it. Those forms were either (1) counteroffers or (2) rejections coupled with an invitation to submit a new offer. Either way, when CIC filled out and signed (by an officer) the Harbor Proposal and the National Union Application—neither of which "incorporated" the financial statements—the Form Renewal Proposal dropped out of the picture.[14]

---

**11.** [Footnote by this Court] As NU Ex. G shows, the National Union Application (but *not* the Form Renewal Proposal) was attached to National Union's Policy. By contrast the Harbor Policy (H–A Ex. H) includes neither the Harbor Proposal nor the Form Renewal Proposal as an attachment. That may have been a mere oversight in exhibit preparation, but if not it is conclusive against Harbor, for Ill.Rev.Stat. ch. 73, ¶ 766 ("Section 766") (on which Harbor-Allstate-National Union Mem. 13 relies) says (emphasis added):

No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, *of which a copy is attached to or endorsed on the policy, and made a part thereof.* No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affect either the acceptance of the risk or the hazard assumed by the company.

Thus even assuming arguendo (1) CIC's financial statements were deemed incorporated into the Harbor Proposal and (2) CIC were deemed to have represented their truthfulness, unless Harbor physically attached the Harbor Proposal to its Policy it would not be entitled to rescission on the basis of alleged misrepresentations as to the financial statements (*Economy Fire & Casualty Co. v. Thornsberry*, 66 Ill.App.3d 225, 227, 23 Ill.Dec. 13, 15, 383 N.E.2d 780, 782 (5th Dist.1978)). In any case that principle

would bar rescission based on representations in the Form Renewal Proposal, even if this opinion were wrong as to the superseded status of that Proposal in the contract negotiations. Nothing of record indicates the Form Renewal Proposal was attached to any of the Policies in suit.

**12.** True enough, the National Union Application also says:

THIS FORM AND ALL PREVIOUS APPLICATIONS SUPPLIED TO THE UNDERWRITERS SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO THE POLICY.

But that must be read in conjunction with the earlier language describing "the complete application that shall be the basis of the contract." Each successive renewal incorporates prior renewal applications that had been the bases of prior contracts. That does not mean any application submitted outside the "chain of incorporation" is to be part of the contract, especially where (as here) the relevant provisions of the Form Renewal Proposal conflict with those of the National Union Application. Further, under Section 766 the requirement of physical attachment would still defeat a claim based on representations in the Form Renewal Proposal.

**13.** It would not alter matters that the Form Renewal Proposal was used by Rollins as a means of soliciting bids (see n. 4). Any insurer was free to retain the Proposal's language in the insurer's bid, and it is surely reasonable to treat the non-retention as significant.

**14.** Such conventional offer-and-acceptance analysis ascribes relevance to any language

None of the force of that analysis is vitiated by the Harbor-Allstate-National Union assertion of an insured's obligation to deal truthfully with an insurer (*Apolskis v. Concord Life Insurance Co.*, 445 F.2d 31, 35 (7th Cir.1971)). By the terms of their own forms, neither Harbor nor National Union asked CIC to represent or warrant[15] the truth of the financial statements. They merely asked the statements be "attached." CIC did that. And it did deal truthfully: It neither lied nor held back information the insurers requested—the problem in *Apolskis*. Its disclosure gave each insurer the opportunity to decide which (if any) of the items so disclosed would be requested as added representations or warranties (over and above the answers to specific application questions).

Again it should be emphasized: Harbor and National Union got just what they asked for, no more, no less. This game was played with their prescribed bat and ball, and they cannot now be heard to complain CIC should have substituted better equipment (*Preferred Risk Mutual Insurance Co. v. Hites*, 125 Ill.App.2d 144, 152–53, 259 N.E.2d 815, 819–20 (3d Dist.1970)). As the Form Renewal Proposal showed, it was no trick at all for the insurers to extend representations of truthfulness to the attached documents. And this is not a matter of second-guessing or hindsight, for the Form Renewal Proposal (which did call for just such a representation) *preceded* the corresponding documents prepared by the insurers. Harbor and National Union are hoist on petards of their own design.

It is therefore proper to cut off discovery as to the actual truth or falsity of the 1980 financial statements. Unless CIC represented or warranted the financial statements' accuracy, there can be no question of *mis*representation (contrast *Weinstein v. Metropolitan Life Ins. Co.*, 389 Ill. 571, 577, 60 N.E.2d 207, 210 (1945)). And if the misrepresentation issue drops out, no discovery is needed to determine whether or not CIC characterized the financial statements accurately. Harbor and National Union may perhaps have looked to the financial statements in calculating their risks, but in the circumstances any such reliance is not contractually enforceable. In law, the insurers were bound to rely on their own independent researches.[16]

### Count II: False "No Loss Circumstances" Assertions

Count II says Harbor-Allstate-National Union should not have to pay out on claims arising from the underlying substantive litigation because CIC's Harbor Proposal and National Union Application falsely asserted CIC was unaware of any circumstances that would give rise to those claims. Harbor, Allstate and National Union reason this way:

1. In 1969 (as to Harbor) and 1976 (as to National Union) CIC submitted applications for D & O coverage (the "1969–1976 Applications"), both containing the language (H–A ¶ 110; NU ¶ 107):

> No fact, circumstance or situation indicating the probability of a claim or action against which indemnification is or would be afforded by the proposed insurance is now known to any director

---

changes from offer to counteroffer, though a contracting party's changes that operate against its own interest do fit a little awkwardly into that notion. What is plainly relevant for current purposes, though, is that the incorporation-by-reference language was tendered to the insurers, was available to them and was not used by any of them.

**15.** Though the Harbor Proposal reads in "representation" terms while the National Union Application uses "warranty" language, Section 766 puts those two terms on an equal footing (*Anderson v. John Hancock Mutual Life Insurance Co.*, 316 Ill.App. 338, 342, 45 N.E.2d 39, 41 (1st Dist.1942); see also Ehrenzweig & Kessler, *Misrepresentation and False Warranty in the Illinois Insurance Code*, 9 U.Chi.L.Rev. 209, 212 (1942) (quoting comments of the Illinois Insurance Code Annotating Committee)).

**16.** In that respect, the Form Renewal Proposal had also invited any further investigation and inquiry the insurers wanted to make:

> 13.... The Insurer is hereby authorized to make any investigation and inquiry in connection with this proposal as it may deem necessary.

or officer of this company; and it is agreed by all concerned that if there be knowledge of any such fact, circumstance or situation, any claim or action subsequently emanating therefrom shall be excluded from the coverage under the proposed insurance.

2. Each of the Harbor Proposal and the National Union Application expressly incorporated the relevant 1969–1976 Application.

3. That means CIC represented in 1981 it had no knowledge of circumstances or situations indicating the probability of the claims now being asserted in the underlying substantive litigation.

4. That representation was false.

5. Therefore the claims now being asserted in the underlying substantive litigation are excluded from coverage under the Policies.

That analysis, however, falters at the third step.

All the Policies in suit are of the "claims made" variety. They cover claims asserted during the period of coverage, though those claims may have arisen before the insurance took effect.[17] For that reason the insurer has an interest in evaluating (and limiting) its risk up front by obtaining identification of any then-known incipient claims that might be asserted during the coverage period. Hence the "no loss circumstances" representation required in the 1969–1976 Applications.

But neither Harbor nor National Union asked for a new representation of that same kind in 1981. Instead the Harbor Proposal spoke of itself as:

a supplement to the proposal dated *8/15/69* and that proposal together with this renewal proposal shall constitute the complete proposal. . . .

And the National Union Application referred to itself as:

a supplement to the application completed on *February 27, 1976* and that application together with this renewal supplement constitute the complete application. . . .

■ Through that incorporating language, Harbor and National Union say they have a reaffirmation, updated as of 1981, of the representations in the 1969–1976 Applications. But Illinois law is squarely against that position. For over a century it has been clear that representations speak as of the date made, and a reaffirmance of a prior representation reaffirms its truth only as of that date (*Schroeder v. Trade Insurance Co. of Camden,* 109 Ill. 157, 162 (1883)):

To give the adoption into a policy of an application made at some former time, the effect of a representation as to the present condition of the property insured, it would seem but fair that there shall be some language which will suggest to the mind the idea of representation as to present condition, so that the assured may not, by general language of such adoption, be entrapped into the making of representations he never designed to make.

That doctrine remains Illinois law today: *Marshall v. Metropolitan Life Insurance Co.,* 405 Ill. 90, 100–01, 90 N.E.2d 194, 199 (1950) specifically reaffirmed and applied that language from *Schroeder* to facts parallel to those in the present cases. And that reflects general insurance-law doctrine, 7 Couch, *Cyclopedia of Insurance Law* 2d § 36:23, at 450 (1985):

Warranties made at the issuance of an original policy continue binding during the period of renewal but relate only to conditions existing at the time they were made. So a renewal policy, based upon a warranty as to noncancellation of other insurance made in obtaining the original policy, is not avoided by the cancellation of other insurance subsequent to the writing of the original policy, where the breach is based on the original warranty.

Harbor-Allstate-National Union proffer no authority at all to sap the vitality of those

---

17. At the other end of the spectrum, the Policies do not cover claims that arise during the effective period but are not asserted until after coverage lapses.

specific holdings and that general authority.

■ Once again the rule of strict construction against the drafter comes into play. Harbor and National Union asked for representations as to no-loss-circumstances very clearly in the 1969–1976 Applications. They could easily have done so in 1981, but instead they relied (they *now* say) on an incorporation-by-reference approach, which is most ambiguous at best. In fact, FDIC R. Mem. 4 correctly observes Harbor did get a specific no-loss-circumstances representation in connection with the 1982 Policy—the Anderson Letter. At that date it did not rely on prior documents.

True enough, CIC is not the untutored layman portrayed in most insurance cases. Its officers and directors are experienced business people. But that does not argue favorably for a looser construction of the insurers' documents. Even on the assumption there is no inequality of bargaining skill, each party should take just what it bargained for and not rest on self-created ambiguities. Certainly CIC must have had some idea of the risk analysis used by D & O insurers. But equally certainly CIC had no obligation to put whatever sophistication it had at the service of Harbor and National Union (an important part of whose business it is to draft the documents that define the risks they choose to insure). Each side must be assumed to know its own business best. There may be little value in a 1981 reaffirmance that CIC knew of no loss circumstances in 1969 or 1976, but *Schroeder* and its more recent incarnations teach that is all Harbor and National Union asked for and got.

■ Finally Harbor-Allstate-National Union Mem. 24 says CIC had a continuing legal duty to advise them of changed conditions materially affecting the risk they assumed. But that rule applies only during the pendency of an application—that is, where statements in an application become untrue between the time the application is submitted and the time the policy is issued. That is the rule expressed in the cases Harbor-Allstate-National Union Mem. 24

cites, and it rests on offer-and-acceptance notions (*Carroll v. Preferred Risk Insurance Co.*, 34 Ill.2d 310, 312, 215 N.E.2d 801, 803 (1966); *Western Fire Insurance Co. v. Moss*, 11 Ill.App.3d 802, 812–15, 298 N.E.2d 304, 312–14 (1st Dist.1973)).

Here no allegation is made concerning any circumstances represented as true in the Harbor Proposal and the National Union Application but no longer true as of the date the Policies were issued—there was thus no uncommunicated change in the terms of the offer (the insurance application). Harbor-Allstate-National Union would extend the duty expressed in *Carroll* and *Western Fire* forward and backward in time far beyond the doctrine's limits. If Harbor and National Union wanted to know about loss circumstances arising between 1969 or 1976 and 1981, they need only have asked. Indeed the obvious significance of such an inquiry, coupled with their failure to make it directly, cuts strongly against ceding the issue to them by default.

There are no material fact issues as to Count II, and the law is on FDIC's side. Count II is dismissed.

## Conclusion

Both FDIC motions are granted. As to Count I, discovery is limited to those issues not concerning the truth or falsity of CIC's 1980 financial statements attached to the Harbor Proposal and the National Union Application (or provided earlier in connection with those two documents). As to Count II, FDIC is granted judgment on the pleadings and that Count is dismissed.