**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**HARBOR INSURANCE COMPANY and Allstate Insurance Company, Plaintiffs,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**No. 85 C 7080, 85 C 7081.**

United States District Court, N.D. Illinois, E.D.

May 18, 1987.

See also 661 F.Supp. 964.

James G. Hiering, Dennis C. Waldon, Jeffrey I. Berkowitz, A. Benjamin Goldgar, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

Barry S. Rosen, Candace J. Fabri, Duane F. Sigelko, Sachnoff, Weaver & Rubenstein, Ltd., Franklin Auwarter, Michele Odorizzi, Mayer, Brown & Platt, Chicago, Mark I. Rosen, FDIC, Washington, D.C., for defendants.

SHADUR, District Judge.

## MEMORANDUM OPINION AND ORDER

Harbor Insurance Company ("Harbor"), Allstate Insurance Company ("Allstate") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively "Insurers") have sued Continental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank")[1] and a host of other defendants, seeking to avoid liability under the directors' and officers' ("D & O") liability policies (the "Policies") Insurers had issued to CIC.[2] Earlier this year Continental and Federal Deposit Insurance Corporation ("FDIC") (collectively "Movants") obtained a Fed.R.Civ.P. ("Rule") 37(a) order (the "Order") from Magistrate Joan Lefkow[3] compelling Insurers to produce documents and respond to Movants' interrogatories.

Insurers now move to set aside Order ¶¶ 1 and 2(B)(2) under Rule 72(a). For the reasons stated in this memorandum opinion and order, their motion is granted in part and denied in part.

### Magistrate Lefkow's Order

Movants submitted their first set of interrogatories and request for the production of documents to Insurers January 30, 1986. Those discovery requests included Interrogatory ("Int.") Nos. 17 and 18 and Document Request ("Req.") Nos. 5 and 7, which are central to Insurers' present motion.[4]

Int. 18 asked Insurers to identify:

1. all the reinsurers that share any of the risk covered by the Policies,

2. all documents "that reflect or refer to communications between [Insurers] and the reinsurer" as to sharing the risk and contesting coverage under the Policies and

3. all reinsurers' employees who took part in any such communications.

Req. 5 followed up on that question by requesting:

All documents that reflect or refer to communications between [Insurers] and reinsurers regarding Continental that occurred during the period from January 1, 1976 to date.

Int. 17 asked that Insurers:

Identify all persons who were involved in deciding that the issuance of the 1981

---

1. CIC and Bank are collectively called "Continental."

2. Because this Court has typically begun all its opinions in these cases with the same opening description, some means of early differentiation is useful. Solely for that purpose, it is noted this is this Court's twentieth written opinion since the cases were assigned to its calendar after a series of recusals by other judges of this District Court. For the same ease in reference, earlier opinions will also be cited by number.

3. Supervision of all discovery in these actions is being conducted by the Magistrate.

4. Each of FDIC and Continental submitted a set of interrogatories and document requests to all three Insurers. Because the submissions and Insurers' responses at issue here were essentially identical, this Court will follow the parties' lead and refer specifically only to FDIC's submissions. This opinion will also refer where necessary to the respective exhibits submitted by the parties: "IX—" for Insurers' and "MX—" for Movants'.

Policies had allegedly been obtained by the submission of false or misleading information and identify all documents that were prepared or reviewed by those persons in reaching said decision.

Then Req. 7 called for:

All documents that reflect or refer to standards, policies, practices or procedures applicable to any aspect of [Insurers'] business of writing directors and officers liability insurance that were in effect during the period from January 1, 1976 to date....

Insurers responded April 2, 1986. They claimed the information sought by Ints. 17 and 18 was protected by attorney-client and work-product privileges and was also "irrelevant." They refused to provide the materials asked for in Req. 5 because "irrelevant," but they agreed to respond to Req. 7 within certain limitations.[5]

Insurers and Movants unsuccessfully attempted to resolve their disagreements outside the courtroom (a procedure mandated by this District Court's General Rule 12(d)). Movants then sought the Magistrate's issuance of an order to compel under Rule 37(a). After a December 30, 1986 hearing (the "Hearing") on that motion, Magistrate Lefkow issued the Order.

Order ¶ 1(A) requires Insurers to respond to Int. 18 by identifying all reinsurers that share any of the risk covered by the Policies and to produce copies of those reinsurance agreements. Order ¶ 1(B) requires Insurers to respond to Req. 5. Order ¶ 2(A) compels responses to Int. 17 and Req. 7.

One other provision of the Order requires more elaboration. Order ¶ 2(B)(2) compels the production of the same documents Insurers had previously disclosed in similar but unrelated litigation. At the Hearing Movants claimed National Union had not produced all the documents called for in Req. 7, even though National Union had not challenged that request. As proof of such noncompliance Movants pointed to National Union's response to an identical request in the *Butcher Bank* litigation in Tennessee referred to in n. 16 of this opinion.

FDIC is also a defendant in *Butcher Bank* and has access to the discovery materials there.[6] When FDIC compared National Union's documentary responses in *Butcher Bank* and here, it found several disparities in—omissions from—the production in these cases.[7] Because of that noncompliance, Movants asked that Insurers be required to produce all documents furnished in similar lawsuits in response to requests identical to Req. 7. Order ¶ 2(B)(2) granted that relief.

### Insurers' Appeal

As already stated, the current appeal challenges Order ¶¶ 1 and 2(B)(2).[8] Insurers advance three contentions:

1. Communications with their reinsurers are either not discoverable under Rule 26(b)(1) or, if discoverable, can be obtained by a less burdensome method as "required" by Rule 26(b)(1)(i).

2. Insurers' reinsurance agreements are not relevant and do not fall within the coverage of Rule 26(b)(2), which expressly makes insurance agreements discoverable.

3. Order ¶ 2(b)(2) is unduly burdensome and unnecessary.

---

5. Insurers properly objected to the request as overly broad if read to require the production of every document generated by Insurers while conducting their D & O liability insurance business.

6. Movants reported at the Hearing that the initial protective order in *Butcher Bank* had been lifted, making the documents produced by National Union in that case generally available (MX 1, at 58).

7. Exactly how many documents are missing has not been established. Movants refused to reveal everything they know to be missing (MX 1, at 61–62).

8. Insurers' claims of privilege are not in issue. Order ¶ 6 requires Insurers to submit a schedule specifying what documents they claim are privileged and their basis for each claim. They do not appeal that provision of the Order.

■ Under Rule 72(a) the Order must be affirmed unless it is clearly erroneous or contrary to law. Under that standard Insurers' attacks on Order ¶ 1 miss the mark, so that part of the Order is affirmed. However, Insurers' complaint as to Order ¶ 2(B)(2) has partial merit, requiring modification of that provision.

### Insurers' Communications with Their Reinsurers

Insurers claim their pre- and post-issuance communications with their reinsurers as to Continental are not (Rule 26(b)(1)):

> relevant to the subject matter involved in the pending action ... [or] reasonably calculated to lead to the discovery of admissible evidence.

Insurers are wrong. Order ¶ 1(B) fully comports with the liberal scope of discovery prescribed by Rule 26(b)(1) (*Dykes v. Morris*, 85 F.R.D. 373, 375 (N.D.Ill. 1980)).[9]

■ Insurers' pre-issuance communications with reinsurers sharing any of the risk under the Policies may well be relevant to Insurers' claim under Complaint Count I. That count prays for rescission of the Policies because of CIC's alleged misrepresentations as to its true financial condition. One element of any misrepresentation claim is actual reliance (see *Teamsters Local 282 Pension Trust Fund v. Angelos*, 649 F.Supp. 1242, 1245–46 (N.D.Ill.1986)). Such pre-Policy-issuance communications may reveal what financial information Insurers relied upon when deciding to issue the Policies.

Insurers claim Movants are pursuing inconsistent positions by simultaneously (1) asking to discover the information Insurers relied on when issuing the Policies and (2)

arguing that the Ninth Opinion, 643 F.Supp. 1434 (1986) effectively eliminated most of Insurers' Count I claim. That misses the thrust of the Ninth Opinion as setting an *outer* boundary—as limiting the information on which Insurers could legally and justifiably rely in issuing the Policies. What remains an issue is what information Insurers *actually* relied on. Movants are entitled to learn whether Insurers in fact reached the permissible outer limits of reliance or operated somewhere within them. Information provided under Order ¶ 1(B) would be relevant to that issue.

Moreover, Insurers have proffered, and this Court recently allowed in part, amendments to the Complaints that may revive Insurers' claims under Count I. Insurers' new allegations introduce the issue of custom and practice in the D & O insurance industry into these cases (see the Eighteenth Opinion, slip op. (Apr. 24, 1987)). Insurers' pre-issuance communications with their reinsurers would be relevant on that score.[10]

■ Insurers' post-issuance communications with their reinsurers would be relevant to the issues raised by Complaint Count VII and by various defendants' Counterclaims. Under Count VII Insurers attempt to avoid coverage under the Policies because of certain defendants' alleged breach of their duty to cooperate with Insurers. Specifically Insurers point to several settlements in the underlying securities litigation as evidence of that failure to cooperate. Many defendants have filed counterclaims against Insurers asking damages for alleged vexatious and unreasonable conduct under Illinois Insurance Code § 155, Ill.Rev.Stat. ch. 73, ¶ 767, and breach of contract (see the Fourteenth Opinion, 652 F.Supp. 858 (1986)).

---

9. Insurers initially argued Order ¶ 1(B) was overbroad because it could include communications with reinsurers that do not share in the risk under the Policies. Movants have agreed (Movants' Mem. 9 n. 6) that Order ¶ 1(B) is to be limited to reinsurers required to be identified in Order ¶ 1(A) (those who share that risk).

10. Though this is of course not controlling, Insurers' complaints of Movants' inconsistency are themselves inconsistent. Insurers conveniently ignore the inconsistency between (1) their own insistence that discovery is impermissible when it may lead to information as to matters on which they relied and (2) their own persistent efforts to keep their reliance on Continental's financial information a live issue in these lawsuits.

Insurers may well have discussed their positions on the proposed settlements, or their positions in general in the underlying securities litigation, with some or all of their reinsurers. Any such discussions would obviously be relevant to the issues raised by Count VII and the Counterclaims. Movants are entitled to find out the facts in that area.

■ As a fallback position, Insurers say that even if communications with their reinsurers are discoverable, Movants should be forced to get that information by deposing Insurers' claims personnel and any of their reinsurers' employees who actually communicated with those people. Insurers urge that because of:

> the variety of reinsurance relationships, and the divergent and complicated methods of allocating any loss that plaintiffs might incur ...

depositions would be much simpler and less burdensome than actual document production. They point to Rule 26(b)(1)(i), which calls for limiting discovery if it:

> is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive.

But Insurers have not begun to meet the burden of showing the deposition alternative would be "more convenient, less burdensome, or less expensive." Depositions are themselves expensive. They are a singularly unsuitable (because inefficient and therefore costly) method for information-gathering if the questioner is compelled to depose witnesses (here Insurers' claims personnel) without any background information. Indeed, Insurers' own emphasis on the complicated nature of their reinsurance arrangements actually supports the need for document production *before* Movants depose Insurers' employees. Rule 26(b)(1)(i) cannot be used to force Movants to play Go Fish during those depositions.

Insurers do not at all identify how Order ¶ 1(B) would really burden them unduly. As Movants point out, *they* have already provided Insurers with over 1 million documents during the course of discovery. Insurers' claims of hardship ring hollow, absent specific evidence to back up those claims.

*Reinsurance Agreements*

Insurers claim both the identity of their risk-sharing reinsurers and the reinsurance agreements themselves are irrelevant and not discoverable under Rule 26(b)(2). Again they are wrong on both counts.

■ Insurers attempt to show the irrelevance of their reinsurance arrangements by discussing the various types of reinsurance and arguing that, because of the nature of their reinsurance agreements, their reinsurers did not take part in assessing the risk before issuing the Policies or in contesting coverage later. But the things Insurers do not talk about are more telling than what they do discuss. There can be no question they communicated (pre- or post-issuance or both) with their reinsurers about the Policies. Regardless of the legal nature of the reinsurance arrangements, those communications are relevant. For Movants to understand the significance of those communications, the reinsurance agreements may be needed and are thus relevant.[11] They surely could lead to the discovery of admissible evidence—the low threshold of Rule 26(b)(1).

■ Even were that not the case, the reinsurance agreements are discoverable under Rule 26(b)(2):

> A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action

---

11. As Movants note, those agreements would also be relevant for determining what communications should have taken place.

or to indemnify or reimburse for payments made to satisfy the judgment. Reinsurers ("person[s] carrying on an insurance business") are Insurers' own insurers. If Insurers are held liable under the Policies, they will turn to their reinsurers for partial indemnification, as provided in the reinsurance agreements, for any "payments made to satisfy the judgment."[12]

Insurers contend their reinsurance agreements are not "insurance agreements" under Rule 26(b)(2). True enough, reinsurance agreements are a special breed of insurance policy. Reinsurance is (13A Appleman, *Insurance Law and Practice* § 7681, at 480 (1976)):

> the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss.

But the English language remains the same: Reinsurers "carry[ ] on an insurance business" and "may be liable ... to indemnify [Insurers] for payments made to satisfy the judgment" that Movants hope to obtain. Rule 26(b)(2) does not require that a party's insurer be directly liable to the other party. It is totally irrelevant that the reinsurers would pay Insurers and not the

defendants and that Movants cannot directly sue the reinsurers.[13]

Insurers invoke some vintage cases in purported support of their position. *Baltica Insurance Co. v. Carr*, 330 Ill. 608, 613, 162 N.E. 178, 180 (1928) distinguished between insurance and reinsurance for business tax purposes, a distinction also recognized in *Citizens Casualty Co. of New York v. American Glass Co.*, 166 F.2d 91, 94–95 (7th Cir.1948)(a contract action)—though the latter case sensibly observed such a difference in classification is "not too important" (*id.* at 95). But what of it? *Baltica* itself (330 Ill. at 612, 162 N.E. at 180) (emphasis added) characterized reinsurance agreements as "a contract of *indemnity* by the reinsuring company," entered into by "the direct writing insurer to protect itself against a part of its liability." Reinsurance agreements are thus "insurance agreements" for the direct insurers within the literal coverage of Rule 26(b)(2).[14]

That literal reading of Rule 26(b)(2) conforms entirely to the policy considerations underlying the Rule, which was added in 1970 because (Advisory Committee Note):

> Disclosure of insurance coverage will enable counsel for both sides to make the same realistic appraisal of the case, so that settlement and litigation strategy are based on knowledge and not speculation.

Although any prospects of settlement in these cases may be remote, the Note

---

**12.** Rule 26(b)(2) does not depend on the scope or amount of indemnification. It is enough that the reinsurers would be liable to Insurers for part of any judgment based on the Policies. Whether indemnification occurs because a reinsurer has accepted a part of the risk under all of Insurers' D & O policies, or just under these specific Policies, does not matter either.

**13.** As has too frequently been true in this litigation, Insurers' argument has to be viewed as more than a little disingenuous. Except in the few jurisdictions with direct-action statutes, an injured third party cannot sue the insurer under a garden-variety liability policy either. Would Insurers assert that inability renders such policies nondiscoverable under Rule 26(b)(2)? Surely not—at least in good conscience.

**14.** Insurers lean heavily on an isolated statement in *Baltica*, 330 Ill. at 613, 162 N.E. at 180:

> The [reinsurance] contract is not one of insurance, but simply one of indemnity.

That, however, was said in the context of construing a tax on doing business in Illinois—on issuing policies underwriting Illinois hazards. Rule 26(b)(2) asks a very different question, and it provides a very different answer. Again, reinsurers are themselves insurance companies whose insureds are other insurance companies. Finally, that fact renders inapropos the qualification in the Official Comments making Rule 26(b)(2) applicable only to indemnification agreements by insurance companies and not to such agreements by "ordinary business concerns."

speaks of "litigation strategy" as well. Movants are entitled to "knowledge and not speculation," including such knowledge as to Insurers' actual stake in the controversy.[15]

### Discovery in Other Litigation

Order ¶ 2(B)(2) directs Insurers to produce copies of all the documents produced by them in six other unrelated cases in response to document requests identical to Req. 7.[16] Movants say such an order is justified by National Union's demonstrated failure to produce *all* the documents called for by Req. 7. Apparently Order ¶ 2(B)(2) is intended to assure Movants they will receive everything to which Order ¶ 2(a) entitles them.[17] But Order ¶ 2(b) is unnecessary for that purpose, for another far less burdensome means exists for checking Insurers' current and continuing compliance.

■ National Union's failure to produce everything described by Req. 7 is unexplained. Where as here thousands of documents are involved, some inadvertent omissions would hardly be surprising—and would certainly pose no grounds for suspicion. But inadvertence or some other innocuous explanation seems less probable when National Union has merely been asked to repeat precisely the production it has furnished not long before (and indexed carefully), yet discrepancies appear the second time around.[18] Those discrepancies do justify Movants' concerns about Insurers' present and future compliance,[19] but they do not justify Order ¶ 2(B)(2).

As decreed by Magistrate Lefkow, Order ¶ 2(B)(2) would place a major and needless burden on Insurers. Total duplication of the document production from six other lawsuits would be expensive and time-consuming. And that solution, involving the unnecessary delivery to Movants of multiple copies of the same documents, would scarcely let the "punishment" fit the "crime."[20]

In fact, any such delivery in bulk—if unaccompanied by indices of the documents produced—would make Movants' task of identifying any newly-received documents similarly expensive and time-consuming.

---

15. In that respect, too, reinsurance is not conceptually different from an automobile driver's collision insurance in a tort case: Reinsurers assume part of the risk of loss, affecting pro tanto Insurers' actual potential liability.

16. That would embrace the production in *National Union v. FDIC, et al.,* No. 3–84–458 (E.D. Tenn.) (the *Butcher Bank* case); *National Union v. Seafirst Corp.,* et al., 662 F.Supp. 36 (W.D.Wash. 1986); *National Union, et al. v. Pacific Resources, Inc.,* Civil No. 84–1188 (D.C. Hawaii); *Unocal Corp., et al. v. Harbor, et al.,* No. C550 393 (Cal.Super.Ct., Los Angeles Cty.); *Harbor v. Southern California Savings & Loan Corp., et al.,* No. CV–86–1159 LTL (C.D.Cal.); *Bettius Fox & Shumate, P.C. v. National Union,* Civil Action No. 86–0070–A (E.D.Va).

17. Magistrate Lefkow's reasoning for including Order ¶ 2(B)(2) is not clear, although she does appear to doubt Insurers' willingness to cooperate in future document production (see MX 1, at 64).

18. Because the *Butcher Bank* litigation was dismissed in December 1985, any document production there necessarily occurred before Insurers' January 1986 response in these cases.

19. True enough, National Union is the only specifically identified "wrongdoer." But when Insurers responded to Req. 7, all three of them were represented by the same counsel, who presumably supervised document production for all of them. Movants' concerns about National Union's compliance therefore reasonably extend to Harbor and Allstate as well. In view of the nonexistent burden imposed by this Court's substitute for Order ¶ 2(B)(2), it is entirely reasonable to make it applicable to all Insurers rather than National Union alone.

20. Indeed, Movants have not revealed the scope of the discrepancies between the *Butcher Bank* document delivery and what has been produced in these cases. Their desire to play their cards close to the vest may reflect an understandable wish to assure that they get full disclosure now. All the same, if the Magistrate's remedy were even to be considered, it would be necessary that Movants disclose to this Court exactly what they find missing, to demonstrate that Insurers are not being subjected to a species of punitive overkill for a minor violation. That prospect of a potentially burdensome judicial task is eliminated by the remedy prescribed here.

And that in itself provides an obvious, and far less burdensome, means to provide Movants the appropriate check on Insurers' compliance with their discovery requests. Insurers have given Movants an index of the documents produced in these cases. Similar indices were doubtless prepared in the other lawsuits covered by Order ¶ 2(B)(2). Those indices alone would give Movants a ready means of verifying Insurers' compliance without the pointless duplication of large numbers of already-received documents. Any then-revealed discrepancies can be cured by the copying and delivery of just the previously undelivered documents.

Accordingly Order ¶ 2(B)(2) in its present form is reversed as clearly erroneous. In its place Insurers are ordered to provide Movants with copies of the indices of their parallel document production in the other six lawsuits identified in n. 16.

### Conclusion

Order ¶ 1 is neither clearly erroneous nor contrary to law (really an understatement). All the information covered by that paragraph is relevant to the issues in these cases or otherwise discoverable under Rule 26(b)(2). Order ¶ 1 must be and is affirmed.

Order ¶ 2(b)(2), however, must be viewed as clearly erroneous in its present form. It is reversed and replaced with the already-described equally effective but far less burdensome order.