**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**HARBOR INSURANCE COMPANY and Allstate Insurance Company, Plaintiffs,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**Nos. 85 C 7080, 85 C 7081.**

United States District Court, N.D. Illinois, E.D.

Jan. 12, 1987.

James G. Hiering, Dennis C. Waldon, Jeffrey I. Berkowitz, A. Benjamin Goldgar, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

William R. Jentes, John T. Hickey, Jr., John W. Donley, Richard F. Levy, Sydney Bosworth McDole, Kirkland & Ellis, Chicago, Ill., for defendants.

MEMORANDUM ORDER

SHADUR, District Judge.

Harbor Insurance Company ("Harbor"), Allstate Insurance Company ("Allstate") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively "Insurers") have sued Continental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank")[1] and a host of other defendants, seeking to avoid liability under the directors and officers ("D & O") policies Insurers had issued to CIC.[2] Two June 18, 1986 memorandum

---

1. CIC and Bank are collectively called "Continental."

2. Because this Court has typically begun all its opinions in these cases with the same opening description, some means of early differentiation is useful. Solely for that purpose, it is noted

opinions dismissed from these actions Gordon R. Corey ("Corey") and William A. Hewitt ("Hewitt") among other defendants (110 F.R.D. 615[3]) and James D. Harper, Jr. ("Harper") (110 F.R.D. 621).

This opinion addresses the motions by Corey, Hewitt and Harper (collectively "Movants") for sanctions against Insurers under Fed.R.Civ.P. ("Rule") 11.[4] For the reasons stated in this memorandum opinion and order, the motions are granted.

### Facts

Although Gordon and Hewitt (former outside directors of Continental) and Harper (a former officer of Bank) had initially been named as defendants in some of the highly-publicized underlying securities litigation brought against Continental, all three had been dismissed as defendants from those cases before Insurers filed these actions. Because Continental had also fully indemnified them for all fees and expenses they incurred while defendants, none of Movants had any basis for a claim against Insurers—and of course they have asserted none. In addition:

1. None of the three Movants was involved in any way in the application for issuance of the D & O policies.

2. Insurers have not identified (or for that matter even suggested) any personal fraud or dishonesty on the part of any of the three.[5]

Insurers were fully aware of all those facts before filing these actions against Movants. Moreover, after Movants had been included as parties defendant, they notified Insurers they had no claims against Insurers and were not parties to any of the underlying securities litigation. Despite that knowledge, Insurers refused to dismiss Movants from these actions unless they agreed to make no future claims of any kind against Insurers at any time. Movants rejected that tie-in requirement and moved successfully for their dismissal by this Court. They now seek, by way of Rule 11 sanctions, reimbursement for their attorneys' fees and expenses incurred in the defense of these cases.

### Rule 11 Standards

Though our Court of Appeals did not immediately acknowledge the important substantive change wrought by the 1983 amendment to Rule 11, it has since firmly aligned itself with the overwhelming body of authority in this area. It is by now universally held that Rule 11 establishes an objective standard, under which the conduct of a lawyer in bringing or maintaining litigation is compared with what would reasonably have been done by a competent attorney after reasonable inquiry. *Indianapolis Colts v. Mayor and City Council of Baltimore*, 775 F.2d 177, 181 (7th Cir.

this is this Court's sixteenth written opinion since the cases were assigned to its calendar after a series of recusals by other judges of this District Court.

**3.** Corey and Hewitt were two of 17 Continental "Outside Directors" (as defined in the cited opinion). None of the other 15 has joined the Corey-Hewitt motion for Rule 11 sanctions. As the opinion (110 F.R.D. at 618–19) reflects, one then-pending lawsuit had named as defendants the other 15 Outside Directors—but not Corey or Hewitt—at the time this action was filed.

**4.** Because Insurers' original responses to the dismissal motions had focused on the merits of that dispute, this Court ordered them to address the Rule 11 considerations separately (110 F.R.D. at 620, 622). Insurers' response addressed to Rule 11 issues (filed July 2, 1986) will

be cited "Ins.Mem. II—." Their earlier memorandum (filed May 27, 1986), directed primarily to the dismissal motion, will be cited "Ins.Mem. I—."

**5.** Ins.Mem. II–8 says the Complaints did allege fraud by all the former officers and directors. As this Court noted in its opinion dismissing the Outside Directors (110 F.R.D. at 619–20), such generalized and unattributed blanket assertions are clearly deficient under Rule 9(b). That is not itself a predicate for Rule 11 sanctions, of course (except to the extent it may reflect Insurers' lack of factual investigation before falsely ascribing "fraud" to defendants as a group and to Movants in particular)—but what *is* relevant is that Insurers have not even hinted (even to this date) any of the three Movants had any personal involvement in any kind of fraud or dishonesty.

1985).[6] Good faith is not a defense to a Rule 11 motion.[7] *Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986).

In its most recent expression on the subject (*District No. 8, International Association of Machinists & Aerospace Workers, AFL–CIO v. Clearing, a Division of U.S. Industries, Inc.,* 807 F.2d 618, 621 (7th Cir.1986) (citations omitted) our Court of Appeals has again said Rule 11 requires "an objective inquiry into whether the party or his counsel 'should have known that his position is groundless....'" On the other side of the coin, it must be kept in mind Rule 11 should not be used to chill fair advocacy, see *Textor v. Board of Regents of Northern Illinois University,* 87 F.R.D. 751, 754 (N.D.Ill.1980). As *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985) (a case relied on in *Indianapolis Colts,* 775 F.2d at 181) put it:

> Courts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer.

Insurers knew all the relevant facts when they filed these actions against Movants and the other Outside Directors. Before they included Movants among the defendants, Rule 11 imposed on Insurers' lawyers the duty to have made reasonable inquiry into the existing case law to determine whether, based on those known facts, a suit against Movants was warranted by that existing law.[8]

By definition that required an analysis into the threshold question for every federal case: whether this Court had subject matter jurisdiction over the purported dispute between Insurers and Movants. *Fitzgerald v. Seaboard System Railroad, Inc.,* 760 F.2d 1249, 1251 (11th Cir.1985) (per curiam). When that issue was later posed to this Court, its two June 18 opinions held no case or controversy existed between Insurers and Movants, who were therefore dismissed on subject matter jurisdictional grounds.

That ultimate ruling on the merits is not of course controlling for Rule 11 purposes (Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 185 (1985)):

> The key to invoking Rule 11 ... is the nature of the conduct of counsel and the parties, not the outcome.

What this Court must rather determine is whether Insurers' counsel had a colorable basis, under then-existing law, for believing an actual case or controversy existed between Insurers and Movants that justified counsel in invoking this Court's jurisdiction. That "existing law" standard was recently summarized in a paper prepared for the annual convention of the Colorado Bar Association (Solovy, Wedoff and Bart-Howe, *Sanctions Under Federal Rule of Civil Procedure 11* at 15 (Oct. 11, 1986) (citations omitted)):

> A pleading or motion is warranted by existing law if it is supported by precedent, if it addresses a question of first impression, or if it concerns an issue on which the law is unsettled.

### Article III "Cases" or "Controversies"

Just when an Article III case or controversy exists in a declaratory judgment ac-

---

**6.** This statement of Rule 11's test has been framed in terms of the lawyer's responsibility. As the Rule makes plain, it applies with equal force to the client's conduct—again in objective rather than subjective terms.

**7.** Bad faith, of course, continues to be an independent ground for Rule 11's application—in the words of the Rule, "any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" will generate sanctions.

**8.** Rule 11 also protects any "good faith argument for the modification or reversal of existing law," but Insurers clearly did not seek to do that. Ins.Mem. I–7 said:

> This litigation presents a classic situation in which the entry of a declaratory judgment of rescission is appropriate.

Nor has Ins.Mem. II shifted ground in that respect. That modification-or-reversal branch of Rule 11 is comparatively unexplored. See, e.g., *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1539–41 (9th Cir. 1986), *rev'g* 103 F.R.D. 124, 127 (N.D.Cal.1984).

tion between an insurer and its insured is scarcely a novel question. As Insurers correctly note, *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941) established the basic test:

> The question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment.

In *Maryland Casualty* and subsequent cases (see, e.g., *Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.*, 416 F.2d 707 (7th Cir.1969)) that test has been held satisfied in some circumstances in which the insured has not yet made a claim against the insurer. In each such instance the insurer faced a "reasonable apprehension of liability" because its insured was involved in litigation or had suffered a loss that could likely result in a claim against the insurer. *Diamond Shamrock*, 416 F.2d at 710.

Seizing upon that "reasonable apprehension of liability" language, Insurers claim their "dispute" with Movants at least arguably satisfied Article III—even though this Court has ultimately ruled Insurers had to lose on that score. Despite the prior dismissal of Movants from all the underlying securities litigation in which they had been named,[9] despite Movants' full prior reimbursement by Continental for all their legal expenses, Insurers say they still faced a real "apprehension of liability." That was present, in their view, because Movants' dismissal had been only "without preju-dice"—leaving open the potential of their being sued again.[10]

That kind of argument, unpersuasive though it proved to this Court (see 110 F.R.D. at 618), might perhaps have been deemed colorable had the existing-law framework been limited to such general statements as those in *Maryland Casualty* and *Diamond Shamrock*. Had that been the case, the fact-based nature of the necessary legal analysis could perhaps have insulated Insurers from Rule 11 exposure.

But the existing—and controlling—case law when Insurers chose to sue Movants was very different from the more generalized statements (and applications) of *Maryland Casualty* and its progeny. Our Court of Appeals had specifically found no "case" or "controversy" existed in *Solo Cup Co. v. Federal Insurance Co.*, 619 F.2d 1178 (7th Cir.), *cert. denied*, 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980), which involved a situation strongly analogous to that here—indeed, a situation from which the absence of a case or controversy in these cases followed a fortiori. In *Solo Cup* the insured had actually sustained an adverse administrative finding (a factor far more conducive to an insurer's "reasonable apprehension of liability" than anything Insurers here could claim), but the administrative agency had not brought any legal action against the insured that might result in a claim against the insurer. Our Court of Appeals held the hypothetical contingency of a *future* claim in those circumstances was insufficient to create a case or controversy because (619 F.2d at 1189):

> The mere possibility that proceedings might be commenced against an insured regarding an act of the insured's as to

---

9. Ins.Mem. II–6 contends one pending lawsuit against Continental had also referred to twenty-five "John Doe" defendants—present and former officers, directors and employees. That anonymous term, however, did not render any of Movants—who remain unserved with process as putative defendants—"parties" to any existing litigation, so as to render noncontingent any claims against them by Insurers.

10. "Without prejudice" dismissal, under the circumstances here, does not bespeak any degree of probability of Movants' being sued again. Caution on the part of plaintiffs' counsel in the securities litigation, on the pure though remote chance that future discovery might uncover a basis for a renewed claim, called for negotiating that kind of dismissal. And the acceptance of that remote risk by Movants' counsel surely did not create a case or controversy under the controlling *Solo Cup* decision discussed in the next portion of the text (and see this Court's prior opinion, 110 F.R.D. at 618).

which the insurer might contest coverage, is not sufficient to create a controversy within the meaning of either the Declaratory Judgment Act or Article III of the Constitution.

Insurers' effort to sweep Movants into their litigation net in these cases, in the face of such a recent on-point holding in the forum that provides the rule of decision, necessarily places them in Rule 11 jeopardy—unless, that is, the hypothetical reasonable attorney, after reasonable inquiry, (1) would have viewed some contrary precedent as justifying suit here or (2) could have distinguished *Solo Cup* from the situation in these cases.[11] Although Insurers' counsel have made no showing of their own pre-lawsuit reasonable inquiry (as Rule 11 mandates), this opinion will proceed to review the matter based on the post-lawsuit inquiry they have demonstrated by their memoranda.

Insurers do not (as they cannot) challenge the controlling force of *Solo Cup* in barring most of the claims they sought to assert against Movants in these cases. Instead they advance a handful of claimed justifications for having thrown Movants into the litigation pot. Each of Insurers' positions fails to survive scrutiny.

### 1. Insurers' Rescission Claims

As they have done throughout this litigation, Insurers seek to blur analysis by lumping everything together—they speak

of having "sought rescission based on the fraud of defendants" (Ins.Mem. II–4), though it hardly needs repetition that Movants are *not* among the "defendants" whose fraud Insurers assert.[12] Lawsuits are not one-size-fits-all garments, with a plaintiff's right to sue one defendant subsuming a right to join everyone else plaintiff chooses to sue. Insurers' right to seek rescission of the D & O policies for fraud by suing *Continental*, against whom multiple live claims by third parties were then pending, is not at issue. What *is* at issue here is whether Insurers were also justified in putting Movants to the trouble and expense of having to hire counsel simply because Insurers *chose* to sue Movants for "rescission" too.

Framed in that (accurate) fashion, the question is easy to answer. Insurers point to nothing except their own unfounded fancies that can support the idea of suing a purely hypothetical, multiply-contingent defendant for rescission of a contract that defendant had no part in obtaining and had no involvement in the alleged grounds for rescission. Neither of the only two D & O cases on which Insurers now seek to peg their claimed reliance—District Court decisions in *Shapiro v. American Home Assurance Co.*, 584 F.Supp. 1245 (D.Mass. 1984) and *Bird v. Penn Central Co.*, 334 F.Supp. 255 (E.D.Pa.1971), *on rehearing*, 341 F.Supp. 91 (E.D.Pa.1972)—helps them.

---

**11.** As the preceding text paragraph has already indicated, one distinction between *Solo Cup* and these cases cuts against rather than for Insurers. There is also one other obvious factual difference, and that too works against Insurers: the fact that *Solo Cup* involved an excess liability policy, while Insurers here have written D & O insurance. As this Court has already said (110 F.R.D. at 618–19), the very nature of Insurers' coverage added still another layer of contingency to the wholly hypothetical nature of their claims. As to Movants (as contrasted with the Continental defendants, who posed a ripe target for Insurers' current lawsuits), Insurers would have faced future liability under the terms of their D & O policies *only* if some theoretical future claim by some theoretical third party were to involve a theoretical action as to which Movants were not entitled to indemnification from Continental. Absent any hint of miscon-

duct on Movants' part that would bar such indemnification, Insurers' reliance on that level of contingency can only be viewed as frivolous.

**12.** One thing Insurers do not offer to explain is just how, given the Rule 11 mandate to conduct a pre-filing *factual* as well as legal inquiry, they can justify having made such an unsupported (and unsupportable) allegation of fraud against Movants. Of course it costs Insurers nothing more to have sued 36 defendants rather than 33, but that surely does not justify Insurers' unexamined assertion of serious charges against innocent parties. Though "talk is cheap" for plaintiffs in that sense, it is not so for the defendants who must retain counsel to defend against the groundless claims. Rule 11 is designed in part to redress that imbalance.

In *Shapiro* the former officers and directors were already defendants in securities fraud cases. *They* sued the D & O insurer, seeking a declaration that they were entitled to D & O coverage. In turn the insurer sought summary judgment on the ground a misrepresentation made by the insured company's president had voided the policy. That proposition was accepted by the District Court in an analysis that treated the matter in contract terms. Nothing in *Shapiro* supports the notion advanced by Insurers that, with their having filed suit for rescission against Continental in these cases, the justiciable controversy was not fully before this Court without including Movants. On the contrary, in *Shapiro* the former officers and directors—having themselves sued because they were confronted with liability—unquestionably had a live case and controversy of their own. Indeed all Ins.Mem. II–8–9 can offer, having cited *Shapiro*, is a fear that this Court might not have agreed with its ruling that fraud in the inducement of D & O policies voided them as to all parties insured—even innocent persons such as Movants. That post-hoc rationalization—relying on a case that cuts *against* Insurers on that score—is scarcely authority for Insurers having disregarded *Solo Cup*.

Only *Bird* did deal with an effort by a D & O insurer to rescind a policy for misrepresentation, joining officers and directors as well as the company in that action. But neither of the *Bird* opinions discloses (or a fortiori discusses) whether the insurers there were facing live claims by the defendant officer-directors. And there is no discussion at all of the case or controversy issue.[13] Even more significantly, *Bird* clearly did not deal with a situation of the kind posed here, in which each of the Movants had already been dismissed out of whatever pending litigation had named them—obviously a reflection of the total absence of any presently-perceived claims against Movants, given the fact the underlying lawsuits remained pending against other defendants. This opinion need not repeat the "speculative double contingency" (110 F.R.D. at 618) that led to this Court's determination that no present case or controversy existed between Insureds and Movants. Like *Shapiro*, *Bird* does not support the necessary belief that the existence of an Article III case or controversy was "warranted by existing law."[14]

Nothing offered by Insurers thus supports their having flouted the clear and direct precedent of *Solo Cup* by joining Movants in a rescission action. They must look elsewhere to escape Rule 11.

### 2. *Insurers' Count IX Claims*

In a classic example of disingenuousness, Insurers assert a real case or controversy because of Count IX of each Complaint and the fact of Harbor's having advanced money to Continental, which Continental in turn used to indemnify Movants and others.[15] Ins.Mem. II–5, which makes that argument, did not disclose that those advances were themselves contingent. It

---

**13.** True enough, subject matter jurisdiction is the first topic any federal court should address. But courts do not always do that, and as our Court of Appeals has recently noted on precisely that subject, *Glidden v. Chromalloy American Corp.*, 808 F.2d 621, 622 (7th Cir.1986):

> When a court resolves a case on the merits without discussing its jurisdiction to act, it does not establish a precedent requiring similar treatment of other cases once the jurisdictional problem has come to light.

**14.** It is instructive to note that Ins.Mem. I did not put the same degree of reliance on *Bird* that Insurers now advance as their justification for having sued Movants (see Ins.Mem. I–8). As for *Shapiro*, Ins.Mem. I–12 cited that case only for the proposition a misrepresentation in the application voids a D & O policy as to everyone—that case was *not* cited at all in Insurers' case or controversy discussion. Thus Insurers' original post-filing inquiry, let alone their undisclosed pre-filing inquiry, did not rest their objective good faith reliance where they now seek to place it—on *Shapiro* and *Bird*. That fact, too, tends to buttress the conclusion that *Shapiro* and *Bird* are weak reeds for Insurers to lean on.

**15.** Once again Insurers engage in a collective-farm approach to litigation, scarcely appropriate to the capitalistic free-market society in which they function. Their Mem. I–5 speaks of their "claims under Count IX of the Complaints" as having "sought recovery of all amounts paid by plaintiffs under the policies from those directors and officers of Continental whose fraud·

was not until later, when motions to dismiss Count IX of each Complaint were briefed, that this Court was told (1) Harbor has only a possibility of becoming entitled to reimbursement of those advances (even from Continental) and (2) that possibility would be realized *only* if Harbor's policy is in fact rescinded.

That belated disclosure led this Court to throw out each Count IX on case or controversy grounds in its September 23, 1986 opinion reported at 646 F.Supp. 746, 751–52. Indeed that opinion (*id.* at 751 n. 16) specifically said Insurers' earlier disclosure of that situation "would surely have been a relevant factor in the motion dealing with CIC's outside directors ...—a factor supporting this Court's conclusion in its June 18 opinions finding the absence of a ripe controversy as to those defendants as well." Insurers cannot bootstrap themselves by pointing to Count IX—a count in which there was plainly no current justiciable controversy—as the predicate for having asserted that very count.

### 3. Insurers' Waiver of Claims

Finally Ins.Mem. 6 urges "the only prudent action for plaintiffs to take was to name Corey, Hewitt and Harper as defendants in the actions to rescind the insurance policies along with the other officers and directors." But it must be remembered Insurers were free to sue—and did sue—Continental for rescission. And again, no act of any of Movants was asserted as the basis for rescission. That being so, any notion of waiver resulting from the nonjoinder of Movants is another bootstrapping effort, because it must necessarily be founded on the premise of a case or controversy with Movants that entitled Insurers to sue them. With that premise having failed, the conclusion of waiver must fall with it.

### Conclusion

Insurers are entitled to a less rigorous analysis in deciding Rule 11 liability than in deciding the merits of the motion that freed Movants from this litigation. However, that less rigorous analysis has confirmed that Insurers' joinder of Movants was not prompted by the kind of pre-filing thoughtful inquiry (and analysis by Insurers' counsel) required by Rule 11. On the contrary, it has again demonstrated Movants were dumped into this action in the fashion described by this Court in its Count IX opinion, 646 F.Supp. at 749–50 n. 10:

This is but another instance of Insurers' efforts in these cases to sweep up all potentially involved actors in what would become litigation of global proportions—the legal equivalent of transforming the assassination of an obscure Balkan Archduke into a world war. Earlier opinions of this Court have been called upon to:

1. dismiss out CIC's outside directors (also for lack of Article III "Cases" or "Controversies") (June 18, 1986 memorandum opinions and orders);

2. dismiss out FDIC (in its capacity as receiver of the Penn Square Bank, N.A.) (July 24, 1986 memorandum opinion and order) and

3. deny an effort to bring into the fray Bank's blanket bond carriers (June 17, 1986 memorandum opinion and order).

That tendency to "file first and think later" (*In re TCI Ltd.*, 769 F.2d 441, 442 (7th Cir.1985)) was aggravated here. Even after Movants were joined as defendants, they sought to extricate themselves by pointing the facts out to Insurers (who really knew those facts already). Insurers responded by seeking to hold Movants hostage to an unconscionable condition: requiring them to give up any possible claim that could arise in the future if some unknown (and perhaps irresponsible) third party chose to sue Movants, and if Movants were then to become entitled to seek D & O

---

ulent conduct caused those payments to be made." Even apart from the often-repeated fact that Movants were *not* in the fraudulent-conduct category, Insurers gloss over any conceiva-

ble justification for such a claim being made by excess insurers National Union and Allstate, which have advanced no such funds at all.

policy reimbursement. Insurers and not Movants must pay the price for the needless legal expense Insurers have forced Movants to incur.

Movants' motions for Rule 11 sanctions are granted, limited to the reasonable attorneys' fees and expenses they have incurred in these actions (including those related to the Rule 11 motions themselves).[16] Because fees petitions inevitably generate further fees, this Court hopes counsel can at least narrow (if not eliminate entirely) any required evidentiary hearing as to the amount of sanctions. Movants' lawyers are ordered to deliver to Insurers' lawyers an itemization of the amounts sought on or before January 26, 1987. This matter is then set for status February 9, 1987 at 9 a.m. to determine what matters (if any) remain in dispute and whether there is any need for an evidentiary hearing.

---

**16.** This opinion has not sought to delve into the kinds of policy issues impacting on whether Rule 11 sanctions here ought to encompass more than mere reimbursement by Insurers alone (see generally Judge Schwarzer's article at 104 F.R.D. 181, 201–05). For example:

1. It is unclear whether the stimulus for the improper inclusion and retention of Movants in the litigation came from Insurers (in which case Insurers ought to bear the cost) or to what extent their lawyer were primarily responsible or were willing "hired guns," acting without attention to their professional responsibilities (in either of which events the lawyers ought to pay the tariff in whole or in part, with no right to recoup by billing their clients).

2. With deep-pocket litigants such as Insurers, who have huge amounts at stake in the litigation and are obviously willing to expend enormous resources fighting even its most minor aspects, there is a serious question whether adding some deductible expenses to their total cost—and only when they are caught—provides enough of a disincentive to such improper conduct.

Unfortunately the limited nature and amount of judicial resources helps to insulate Insurers from the prospect of anything except making Movants whole in this instance.