**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Plaintiff,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**HARBOR INSURANCE COMPANY, et al., Plaintiffs,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**Nos. 85 C 7080, 85 C 7081.**

United States District Court, N.D. Illinois, E.D.

Sept. 23, 1986.

James G. Hiering, Dennis C. Waldon, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

Thomas D. Allen, Kathy P. Saxton, Christopher A. Keele, Wildman, Harrold, Allen & Dixon, Chicago, Ill. and Daniel F. Kolb, Jerome G. Snider, Lawrence E. Wieman, Davis, Ernst & Whitney, Polk & Wardwell, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER [1]

SHADUR, District Judge.

Harbor Insurance Company ("Harbor"), Allstate Insurance Company ("Allstate") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively "Insurers") have sued Continental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank") and a host of other defendants,[2] seeking to avoid liability under the directors' and officers' ("D & O") policies (the "Policies") Insurers had issued to CIC.[3]

---

1. Because all this Court's opinions in these cases tend to begin with the same opening description, some means of early differentiation is useful. Solely for that purpose, it is noted this is this Court's tenth written opinion since the cases were reassigned to its calendar.

2. Those defendants initially included:
    1. Federal Deposit Insurance Corporation ("FDIC");

2. 32 CIC directors and officers; and
3. Ernst & Whinney ("Ernst"), CIC's outside auditors for the years 1980–83.

3. This Court's September 8, 1986 memorandum opinion and order (the "Opinion"), 643 F.Supp. 1434, 1438 n. 5 provides an underwriting breakdown of CIC's D & O coverage.

■ Count IX of each Complaint [4] seeks a declaratory judgment finding Ernst:

1. fraudulently induced Insurers to issue the Policies, and

2. must reimburse Insurers for any payments they may become obligated to pay out under the Policies.

Ernst has moved to dismiss that Count on alternative grounds:

1. under Fed.R.Civ.P. ("Rule") 12(b)(1) [5] for lack of subject-matter jurisdiction;

2. under Rule 12(b)(6) for failure to state a claim of common-law fraud; and

3. under Rule 9(b) for failure to plead fraud with particularity.

For the reasons stated in this memorandum opinion and order, Ernst's motion is granted on the first of those grounds.

### Facts [6]

In mid–1981 CIC decided to increase its D & O liability coverage from $40 to $100 million (NU ¶ 3; H–A ¶ 3). To obtain that coverage CIC submitted renewal proposals (the "Proposals") to Harbor and National Union (NU Exs. A, B; H–A Exs. A, B). Those Proposals required CIC to attach its 1980 financial statement (the "1980 Statement"), and CIC did so.[7]

Ernst (1) conducted the audit that produced the 1980 statement and (2) certified it unqualifiedly (NU ¶ 159; H–A ¶ 164).

Count IX (*id.*) claims the 1980 Statement was "materially false, fraudulent, incomplete and misleading." Insurers say (NU ¶ 169; H–A ¶ 179) they would not have issued the Policies had they known CIC's true financial condition.

Ernst also audited CIC in 1981, 1982 and 1983 and certified CIC's financial statements (the "1981–83 Statements") for those years (NU ¶¶ 167–68; H–A ¶¶ 162–63). Insurers also say (NU ¶ 171; H–A ¶ 176) the 1981–83 Statements were "materially false, fraudulent, incomplete and misleading." All in all, Insurers claim Ernst's allegedly fraudulent certification of the 1980 Statement and the 1981–83 Statements (NU ¶ 178; H–A ¶ 183):

was a direct and proximate cause of the filing of the Class Action and Derivative Litigation which has resulted in claims made against [Insurers] under the Policies.

As is by now legion, CIC's financial reversals during the early 1980s have led to several big-ticket lawsuits against CIC, its officers and its directors (the "Underlying Litigation"). Though Insurers have not yet been called upon to indemnify CIC as a result of the Underlying Litigation, Insurers have conditionally advanced some $3.5 million for defense costs in the Underlying Litigation.[8] CIC has filed a counterclaim

---

**4.** One Complaint is brought by National Union alone, while Harbor and Allstate are coplaintiffs in the other. For present purposes there is no material difference between the Complaints, and for brevity's sake this opinion will simply:

    1. refer to "Count IX," treating both Complaints as one, and

    2. cite to the Complaints in the form "H–A ¶ —" or "H–A Ex. —" and "NU ¶ —" or "NU Ex. —."

**5.** Ernst's first ground for dismissal is not explicitly framed in Rule 12(b)(1) terms, but as the text discussion will show, that is its obvious import.

**6.** None of the relevant facts is disputed. Ernst has submitted one exhibit, the authenticity of which Insurers do not dispute. Tendering matters outside the pleadings does not turn a Rule 12(b)(1) motion into one for summary judgment (*Crawford v. United States*, 796 F.2d 924, 927–28 (7th Cir.1986)).

**7.** 643 F.Supp. at 1436–37 and 1439 describes the Proposals and recites some of their contents.

**8.** That unsubstantiated figure is taken from Insurers Mem. 6. Under the Policies' terms, Insurers agreed to pay defense costs, but (H–A Ex. H at 14, Harbor Policy § A, ¶ 6(A)):

NO COSTS, CHARGES AND EXPENSES SHALL BE INCURRED WITHOUT THE CONSENT OF THE COMPANY, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD....

On November 23, 1983 Harbor agreed to advance part of CIC's defense costs in the Underlying Litigation, on condition that the advance would have to be repaid (1) if the Policies are rescinded or (2) to the extent CIC, its officers or its directors are excluded from Policy coverage (Ernst Mem.App. 3). Apparently only Harbor—the lead underwriter—has actually advanced defense costs so far (compare H–A ¶ 94 with NU ¶ 92).

(the "Counterclaim") seeking a declaratory judgment that it is entitled to the full amount of its defense costs in the Underlying Litigation.[9]

### Subject-Matter Jurisdiction

Insurers have brought the Count IX claim under the Declaratory Judgment Act (the "Act"), 28 U.S.C. § 2201(a) ("Section 2201(a)"):

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought....

Section 2201(a) is not in terms a fount of jurisdiction. Instead *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937) links Section 2201(a) directly to Article III (with its "Cases" and "Controversies" limitation— both those words being jurisdictional terms of art):

The Declaratory Judgment Act of 1934, in its limitation to "cases of actual controversy," manifestly has regard to the constitutional provision and is operative only in respect of controversies which are such in the constitutional sense. The word "actual" is one of emphasis rather than of definition. Thus the operation of the Declaratory Judgment Act is procedural only. In providing remedies and defining procedure in relation to cases and controversies in the constitutional sense the Congress is acting within its delegated power over the jurisdiction of the federal courts which the Congress is authorized to establish.

Of course Section 2201(a)'s restriction to "cases of actual controversy" does not distinguish declaratory judgment actions from any other actions in the federal courts. All such actions are limited by the Article III case-or-controversy requirement. What required "emphasis rather than ... defini-

tion" in the declaratory-judgment context is the greater tendency of declaratory actions to stray from the controversy line.

*Aetna,* 300 U.S. at 240–41, 57 S.Ct. at 464. (citations omitted) teaches:

A "controversy" in this sense must be one that is appropriate for judicial determination.... A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot.... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.... It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts.

Words such as "appropriate" and "substantial" always signal the matter at hand is one of discretion (*International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1217 (7th Cir.1980)) and degree (*Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). Against the benefit of putting uncertainty to an early end must be weighed the disadvantages of (1) using scarce judicial resources to decide a question that may never require resolution and (2) deciding issues presented by parties not yet fully motivated to shoot their best shot (cf. generally *Ashwander v. TVA,* 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).

In Count IX's own terms, Insurers are running ahead of themselves. They do not claim Ernst owes them any money now. Instead they say *if* they end up having to pay out under the Policies, Ernst would be liable to them for the amount of such payment. It follows if Insurers are successful in rescinding the Policies or in avoiding coverage under them (the relief sought in Counts I–VIII), Insurers will have no claim against Ernst.[10]

9. Harbor has moved to dismiss the Counterclaim.

10. This is but another instance of Insurers' efforts in these cases to sweep up all potentially involved actors in what would become litigation

In that sense Insurers' claim against Ernst is much like one for indemnification, for like an indemnitor Ernst has at most a contingent obligation (if any at all) to Insurers. Thus *Cunningham Brothers, Inc. v. Bail*, 407 F.2d 1165, 1169 (7th Cir.) (citation omitted), *cert. denied*, 345 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969) said:

> However in the normal indemnity situation ... no duty to do anything arises until the alleged indemnitee is adjudged liable. Thus, in the instant case, there is no immediate controversy between the parties since it is not certain that plaintiff will ever be compelled to pay any judgment for which [defendant] could be held liable as an indemnitor.... In these circumstances we hold that the interests of justice would not be served by entertaining a declaratory judgment action at this time.

See also *Forty-Eight Insulations, Inc. v. Johns-Manville Products Corp.*, 472 F.Supp. 385, 394 (N.D.Ill.1979) ("Thus *Cunningham* states the general proposition that declaratory relief as to indemnity is unavailable if liability in the underlying action has not been established").

That Insurers' action against Ernst is technically not stated in indemnity terms is irrelevant to the basic "actual controversy" issue. Here, as in *Cunningham* and *Forty-Eight Insulations*, it would be both premature and wasteful to decide an issue that may simply drop out—especially an issue as factually and legally complex as this.

Another factor particularly applicable to this case reinforces the wisdom of the case-or-controversy requirement. By seeking a declaratory judgment against Ernst, Insurers essentially seek an insurance policy for themselves.[11] Should they obtain their desired declaratory relief against Ernst, their incentive to litigate the Policies' validity would substantially decrease. Indeed, they might as well give up their rescission claims, pay CIC and send the bill to Ernst.[12]

That analysis shows Ernst's interests are in a sense aligned with Insurers' at this stage, for both would benefit if CIC's conduct were held fraudulent and the Policies were rescinded. In the same way, a potential indemnitor benefits when its potential indemnitee is found free of liability.

"Controversy" is a term of art intended to identify disputes that have crystallized from a mixed-incentives solution. As *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. at 512 said:

> Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Here the Insurers-Ernst dispute simply has not reached that required level of immediacy.

Insurers retort by arguing the indemnity analogy is faulty for two reasons. Neither of them is persuasive.

of global proportions—the legal equivalent of transforming the assassination of an obscure Balkan Archduke into a world war. Earlier opinions of this Court have been called upon to:

1. dismiss out CIC's outside directors (also for lack of Article III "Cases" or "Controversies") (June 18, 1986 memorandum opinions and orders);

2. dismiss out FDIC (in its capacity as receiver of the Penn Square Bank, N.A.) (July 24, 1986 memorandum opinion and order) and

3. deny an effort to bring into the fray Bank's blanket bond carriers (June 17, 1986 memorandum opinion and order).

**11.** Given the trade plied by Insurers, it is probably more in keeping to speak of their seeking a "reinsurance" policy rather than "insurance."

**12.** Of course at this stage no one has any idea what the size of that bill might be, a matter dependent on the outcome of the Underlying Litigation. Legitimate litigation strategy embraces considerations of possible settlement as well as head-knocking. At this point Ernst has no way of evaluating the financial stakes, and thus has no informed basis for choosing the appropriate approach to the litigation. Though not dispositive, that kind of uncertainty itself highlights why ripeness of any claimed controversy informs the concept of Article III jurisdiction.

First, Insurers say they have a direct action against Ernst for fraudulent misrepresentation. They point out *Tiffany Industries, Inc. v. Harbor Insurance Co.,* 536 F.Supp. 432, 434–35 (W.D.Mo.1982) permitted a D & O insurer (coincidentally, also Harbor) to bring in an accountant as a third-party declaratory defendant in a suit similar to this one.

But as Ernst R.Mem. 5 correctly points out, *Tiffany* addressed only the question whether state law required privity in a negligent misrepresentation action. Nothing was said or decided in case-or-controversy terms. Plainly a case cannot stand as a precedent on an issue neither discussed nor resolved by the court. By the same token, the March 28, 1986 order entered by this Court's colleague Judge Charles Norgle [13] denying Ernst's Rule 42(b) motion also did not treat with the case-or-controversy question and does not compel a different resolution of the present motion.

■ True enough, the legal predicate for Insurers' claim against Ernst is labeled as direct fraud,[14] not derivative liability. But at least in Illinois [15] injury is an integral part of the cause of action in a lawsuit grounded in fraud (*Merit Insurance Co. v. Colao,* 603 F.2d 654, 658 (7th Cir.1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980). Indeed that is the universal rule: Prosser & Keeton, *The Law of Torts* § 110, at 765 (5th ed. 1984) ("substantial damage" is an essential element of fraudulent misrepresentation actions)). As yet Insurers have not been required to pay out under the Policies. If the Policies are rescinded, Insurers will have suffered no injury and will have no fraud claim against Ernst. Thus the Count IX fraud claim is really contingent on the outcome of the non-Ernst counts. There is no cause of action for dishonesty simpliciter.

■ Insurers' second counterargument attempts to address the damages question. Insurers say they have suffered present damages to the extent of the $3.5 million in defense costs already advanced to CIC under the Policies. Of course that is only so as to Harbor, a fact Insurers have conveniently ignored. Further, the wholly conditional nature of Harbor's advances forges an indissoluble link between its ultimate liability for expenses and the rescission issue: If Harbor's Policy is rescinded, CIC must repay all the advances (see Ernst Mem. App. 2, at 2).[16] Thus Harbor's actual injury in respect of the advanced defense costs is just as contingent as its basic liability under the Policy.

Insurers further say the pendency of CIC's declaratory Counterclaim for defense costs proves present or imminent injury and the existence of a live controversy with Ernst. But that Counterclaim only poses a further string of contingencies before any liability could arise:

1. Harbor's motion to dismiss the Counterclaim (itself pitched in part on case-or-controversy grounds) would have to be denied.

2. CIC would have to prevail on its Counterclaim.

3. Insurers would have to lose on the rescission issue.

---

13. Judge Norgle was among several judges of this District Court to whom this case was assigned before its random reassignment to this Court.

14. Nothing said here should be taken to reflect on the merits of Ernst's arguments asserted under Rules 9(b) and 12(b)(6).

15. Throughout this litigation all the parties appear passively to have accepted the proposition Illinois law applies to the fraud claims. This Court will therefore—consistently with the litigants' approach—treat Illinois law as control-ling on that score. See *National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.,* 779 F.2d 1281, 1284–85 (7th Cir.1985); see also 643 F.Supp. at 1438 n. 8.

16. To this Court's recollection, it was not previously apprised of the conditional nature of Harbor's advances to date. That would surely have been a relevant factor in the motion dealing with CIC's outside directors (see item 1 in n. 10)—a factor supporting this Court's conclusion in its June 18 opinions finding the absence of a ripe controversy as to those defendants as well.

Plainly Insurers have as yet experienced no injury in respect of defense costs they have not yet been, and may never be, required to bear. That is doubly so as to National Union and Allstate, which as yet have not even become involved in defense-costs questions.

### Conclusion

Insurers have no present "actual controversy" with Ernst, and federal subject-matter jurisdiction is therefore lacking. Ernst's motion is granted on that ground, and this Court therefore expresses no views as to Ernst's other asserted bases for dismissal.