**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**HARBOR INSURANCE COMPANY and Allstate Insurance Company, Plaintiffs,**

v.

**CONTINENTAL ILLINOIS CORPORATION, et al., Defendants.**

**Nos. 85 C 7080, 85 C 7081.**

United States District Court, N.D. Illinois, E.D.

April 24, 1987.

---

See also 658 F.Supp. 775.

James G. Hiering, Dennis C. Waldon, Jeffrey I. Berkowitz, A. Benjamin Goldgar, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs.

Roger W. Barrett, Franklin P. Auwarter, Michele Odorizzi, Mayer, Brown & Platt, H. Blair White, Walter C. Carlson, Sidley & Austin, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Harbor Insurance Company ("Harbor"), Allstate Insurance Company ("Allstate") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") (collectively "Insurers") have sued Continental Illinois Corporation ("CIC"), its subsidiary Continental Illinois National Bank and Trust Company of Chicago ("Bank") and a host of other defendants, seeking to avoid liability under the directors' and offi-

cers' ("D & O") liability policies (the "Policies") Insurers had issued to CIC.[1] Insurers now seek leave under Fed.R.Civ.P. ("Rule") 15(a) to file amended complaints (the "Amended Complaints").[2] For the reasons stated in this memorandum opinion and order, Insurers' motion is granted in part and denied in part.

### Procedural Background

Insurers originally filed their nine-count Complaints August 9, 1985. After extensive pretrial maneuvering and 17 written opinions by this Court, three counts (Counts II, VIII and IX) have been dismissed[3] and the scope of a fourth (Count I) severely limited by the "Ninth Opinion" described in the next paragraphs.

Count I asks for a declaratory judgment rescinding the Policies on the ground CIC procured those Policies through material misrepresentations and omissions as to CIC's and Bank's financial condition. This Court's Ninth Opinion, 643 F.Supp. 1434 granted the motion of Federal Deposit Insurance Corporation ("FDIC") to limit discovery under Count I. That opinion is of particular relevance to Insurers' present motion.

In the Ninth Opinion this Court dealt with Insurers' legal right, in issuing D & O insurance in 1981, to rely on information then or previously provided by CIC. As the first step toward obtaining such coverage, on July 9, 1981 CIC submitted a stan-

1. Because this Court has typically begun all its opinions in these cases with the same opening description, some means of early differentiation is useful. Solely for that purpose, it is noted this is this Court's eighteenth written opinion since the cases were assigned to its calendar after a series of recusals by other judges of this District Court. For the same ease in reference, earlier opinions will also be cited by number.

2. These are separate actions, one by Harbor and Allstate as plaintiffs, the other by National Union. Hence Insurers have filed two initial complaints and now two Amended Complaints. There were few material differences between the Complaints, and the Amended Complaints retain that similarity. In fact they contain the same counts (with amended allegations) as the Complaints, and the paragraphs in the Amended

Complaints have been renumbered so they mirror each other where possible. For brevity's sake this opinion will simply:
    1. refer to "Count—," treating both Complaints or Amended Complaints as one;
    2. cite to the Amended Complaints in the form "¶ —" unless it is necessary to distinguish between the two, in which case the individual Amended Complaints will be cited "H–A ¶ —" or "NU ¶ —"; and
    3. cite to the Complaints in the form "Original ¶ —," "Original H–A ¶ —" or "Original NU ¶ —."

3. 643 F.Supp. 1434 (the Ninth Opinion) as to Count II, 640 F.Supp. 182 (the Sixth Opinion) as to Count VIII and 646 F.Supp. 746 (the Tenth Opinion) and 652 F.Supp. 867 (the Fifteenth Opinion) as to Count IX.

dard form [4] Renewal Proposal (the "Form Renewal Proposal") through its insurance broker, Rollins Burdick Hunter Co. ("RBH"). CIC attached its 1980 financial statements (the "Financial Statements" [5]) to the Form Renewal Proposal, which expressly incorporated those Financial Statements as part of the proposal.

Harbor and National Union, however, required CIC to fill out and submit Insurers' own forms instead. On August 18, 1981 CIC completed a Renewal Proposal for Harbor (the "Harbor Renewal Proposal"), and on December 16, 1981 it did the same with National Union's Renewal Application (the "National Union Application"). Both companies issued D & O policies to CIC within days of receiving those forms. Neither the Harbor Renewal Proposal nor the National Union Application expressly incorporated any attached Financial Statements as part of the proposal or application, and both forms expressly excluded the Form Renewal Proposal from being a part of the proposal or application.

Accordingly the Ninth Opinion held:

1. Neither the Form Renewal Proposal nor any of the attached Financial Statements was part of any insurance contract between CIC and Insurers.

2. CIC did not represent or warrant the accuracy of any Financial Statements submitted with (but not incorporated into) the Harbor Proposal or the National Union Application.

Any reliance by Insurers on those Financial Statements was therefore not contractually enforceable, and discovery as to their truth or accuracy was prohibited.

On September 25, 1986 this Court denied Insurers' motion to reconsider those rulings. Nothing daunted, Insurers obviously seek by their current proposed amendments to avoid the thrust of the Ninth

Opinion and reintroduce the accuracy of the Financial Statements and Form Renewal Proposal as issues in these cases.

*Proposed Amendments*

Insurers' proposed amendments materially affect their initial factual allegations and their claims for relief under Counts I, IV and VII.[6] Some detailed explanation is needed for full understanding.

First, Insurers seek to add extensive allegations as to custom and practice in the D & O insurance industry to Count I. Specifically ¶ 40 alleges that under such custom and practice, known to CIC:

1. Both the Harbor Renewal Proposal and the National Union Renewal Application were supplementary to, and not a replacement of, the Form Renewal Proposal.

2. Each Insurer would rely on all the information in the Form Renewal Proposal as well as its own proposal or application.

Next ¶¶ 42 and 43 allege, again pursuant to custom and practice:

1. Any Financial Statements attached to the Harbor Renewal Proposal or National Union Renewal Application were "intended and understood to be incorporated into" the proposal or application.

2. CIC warranted and represented the truth and accuracy of all such Financial Statements.

Then ¶¶ 50–51 seek to add several allegations of specific misrepresentations by CIC in the Form Renewal Proposal and the National Union Renewal Application. Finally, ¶ 47 alleges the Form Renewal Proposal and each Insurer's proposal or application (presumably including any attached Financial Statements) were attached to the Policies "and/or" were in the possession of

---

**4.** This term should not be misinterpreted, as Insurers have sought to do in earlier proceedings. It is not intended to denote an industry standard, but merely a form in customary use by CIC's broker—not one tailored for the particular application.

**5.** That term is used in a generic sense to mean all 1980 financial statements, annual reports, Forms 10K, prospectuses and related materials

CIC attached to one or more of the Form Renewal Proposal, the Harbor Proposal and the National Union Application.

**6.** Insurers' Amended Complaints also contain countless minor or cosmetic changes that defendants do not challenge and that do not affect the substance of Insurers' claims. This opinion does not address those changes.

CIC "in its insurance files and in close proximity to the Policies."

Insurers then ask permission to add several allegations to Count I. First, ¶ 110 alleges CIC's misrepresentations and omissions of material fact were wilful and intentional. Then NU ¶ 111 alleges CIC failed to inform National Union of changes that had taken place before National Union issued its D & O policy to CIC December 16, 1981, rendering misleading the financial information provided by CIC in the Form Renewal Proposal. Finally, NU ¶ 112 and H–A ¶¶ 112–13 allege each Insurer, when issuing its Policy, relied upon the Form Renewal Proposal, its own proposal or application, the Financial Statements accompanying them and CIC's associated representations.

As to Count IV, Insurers seek only to add a single allegation, again asserting a custom and practice known to CIC. This time ¶ 130 says Insurers did not intend the Policies to cover any litigation brought by CIC directly against its officers and directors.

Insurers' final effort is to add several allegations and a new claim to Count VII. Those are more accurately supplemental pleadings under Rule 15(d), for they are based on events that occurred after Insurers filed the Complaints.[7] Most particularly, ¶ 156 now alleges defendants have breached their insurance contracts by negotiating settlements in several of the underlying securities cases. During those negotiations defendants allegedly "acted on their own behalf and by and through counsel" (¶ 157). Thus ¶ 162 and the Prayer for Relief call for defendants to bear all the expenses Insurers may have to pay because of those settlements.

### Rule 15

These actions always seem to evoke Pavlovian responses: What one litigant asks, its adversaries automatically oppose. In this instance Insurers begin with a leg up, provided by the Rule 15(a) directive that

"leave [to amend] shall be freely given when justice so requires." Of course that does not mean Insurers win automatically. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) provides the general standard for evaluating Rule 15(a) motions:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of an apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

Insurers claim their proposed amendments merely clarify the allegations in their Complaints and therefore satisfy Rule 15(a) (see, e.g., *Parsons v. General Motors Corp.,* 85 F.R.D. 724, 726–27 (N.D.Ga. 1980)). Defendants retort those amendments are futile, made in bad faith and unduly prejudice defendants, so leave to amend should be denied.

At the outset it is necessary to note a distinction neither side has recognized. As already pointed out, some of the proposed preliminary factual allegations and all the proposed additions to Count VII are in fact supplemental pleadings under Rule 15(d), rather than amendments under Rule 15(a). As for such factual allegations, a similarly generous standard applies (see 6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1504, at 541). But Rule 15(d) calls for a less liberal test for Insurers' proposed new claim, similar to that employed for after-acquired counterclaims under Rule 13(e) (see 6 Wright & Miller § 1506, at 549–50). This opinion will apply the appropriate standards to each proposed amendment, beginning with Insurers' initial fac-

---

**7.** Several of Insurers' new preliminary factual allegations (see ¶¶ 90, 107) are also supplemental pleadings.

tual allegations and proceeding to the amendments to Counts I, IV and VII.[8]

### Custom and Practice Allegations

### 1. Bad Faith, Undue Delay and Undue Prejudice

Defendants correctly argue either (1) bad faith or undue delay in proposing amendments to a complaint or (2) undue prejudice to defendants because of such amendments is a reason for denying leave to amend under Rule 15(a) (see *Foman*, 371 U.S. at 182, 83 S.Ct. at 230). Those factors, however, must always be balanced against Rule 15(a)'s underlying preference for deciding a case on its merits (*Hess v. Gray*, 85 F.R.D. 15, 20 (N.D.Ill.1979)).

█ Although Insurers surely could have included custom and practice allegations in their original Complaint, their failure to do so until now does not show bad faith or undue delay on their part. Until their legal arguments were rejected in the Ninth Opinion (and in the later denial of their motion to reconsider), Insurers doubtless believed such allegations were not necessary. They cannot be faulted for now attempting to add allegations that, in light of the Ninth Opinion, could strengthen their actions. Such allegations, if proved, could affect the merits of these cases.

█ Defendants have also failed to show how Insurers' proposed amendments will cause them substantial prejudice. Insurers have been attempting to hold defendants responsible for the content of the Financial Statements and the Form Renewal Proposal since the inception of these lawsuits. It is hardly surprising that, blocked by the Ninth Opinion, Insurers would renew their efforts by adding allegations of custom and practice.

Insurers correctly point out almost any amendment to a complaint will cause a defendant *some* prejudice. Hence under Rule 15(a) only *undue* prejudice is relevant (*Hess*, 85 F.R.D. at 20). Defendants have the burden of making specific claims of

prejudice (see *Lerman v. Chuckleberry Publishing, Inc.*, 544 F.Supp. 966, 968 (S.D. N.Y.1982)). Their unsubstantiated argument that allowing these amendments will make it impossible to complete discovery before the August 1987 cut-off date does not do the job—even were it established, the task for this Court would be one of balancing the comparative harms, and defendants have not sustained their burden in that respect. Adding an issue, such as the accuracy of the Financial Statements, to a case is generally insufficient to create such undue prejudice (*Lerman*, 544 F.Supp. at 968).

### 2. Section 154

█ Defendants next argue it is futile for Insurers to try to bring the Financial Statements and Form Renewal Proposal back into these cases via allegations of custom and practice. Their argument is double barreled. Because their first contention, based on Illinois Insurance Code § 154 ("Section 154," Ill.Rev.Stat. ch. 73, ¶ 766), would have the same general effect on all such allegations by Insurers, it will be dealt with first.

Section 154 provides:

No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, of which a copy is attached to or endorsed on the policy, and made a part thereof. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company. This section shall not apply to policies of marine or transportation insurance.

---

8. As suggested in n. 6, leave to amend is granted for all amendments not directly addressed in this opinion. Those untreated amendments are minor and generally helpful in clarifying Insurers' claims.

Insurers attempt to satisfy Section 154 by alleging in ¶ 47:

> When the Policies were received by [CIC] and afterwards, the Renewal Proposals were attached to the Policies, and/or the Renewal Proposals at all relevant times were in the possession of [CIC] in its insurance files and in close proximity to the Policies.

That carefully ambiguous allegation [9] fails to satisfy the requirements of Section 154.

To rely on the alleged misrepresentations in the Form Renewal Proposal, the Harbor Renewal Proposal, the National Union Application or the Financial Statements as a basis for rescinding the Policies, Insurers must be able to allege in good faith that copies of the relevant documents were *physically* attached to the Policies when issued to CIC. *Campbell v. Prudential Insurance Co. of America*, 15 Ill.2d 308, 312, 155 N.E.2d 9, 11 (1959). CIC's separate possession of those documents, even in "close proximity" to its own files (a function of its clerical efficiency, not of statutory compliance), is not enough.

Insurers' exhibits attached to their Complaints appear to negate the required physical attachment. Although the National Union Renewal Application is attached to the National Union Policy, the Form Renewal Proposal and the Financial Statements are not (NU Ex. G). Not one of the documents in issue—the Harbor Renewal Proposal, the Form Renewal Proposal, the Financial Statements—is attached to the Harbor or Northbrook Policies (H–A Exs. H and I). Nothing suggests those omissions were an error in exhibit preparation rather than reflecting the real facts. Insurers' inability to allege and prove such physical attachment (rather than their proposed "or" alternative) would be fatal to their attempted

reliance on the unattached documents as the basis for rescission. *Farmers Automobile Insurance Association v. Pursley,* 130 Ill.App.2d 980, 984, 267 N.E.2d 734, 737 (5th Dist.1971). Nor can Insurers avoid Section 154 by alleging either fraud in the inducement (*Inter-Insurance Exchange v. Milwaukee Mutual Insurance Co.,* 61 Ill. App.3d 928, 932, 18 Ill.Dec. 927, 930–31, 378 N.E.2d 391, 394–95 (3d Dist.1978)) [10] or incorporation of such documents by the Policy or other documents actually attached (*Economy Fire & Casualty Co. v. Thornsberry,* 66 Ill.App.3d 225, 227, 23 Ill. Dec. 13, 15, 383 N.E.2d 780, 782 (5th Dist. 1978)).

In sum, if the Financial Statements were not attached to the National Union Policy, National Union cannot rescind that Policy because of misrepresentations in those documents. And that is true even if the National Union Renewal Application, which apparently was attached to its Policy, incorporated those Financial Statements expressly or because of custom and practice.[11] Like principles apply to the other Policies. Insurers' allegations of incorporation because of custom and practice, rather than physical attachment, are at war with the mandate of the Illinois legislature. Those allegations are indeed irrelevant and futile.

■ Insurers ask this Court to carve out an exception to Section 154 for D & O insurance. Our Court of Appeals has already rejected one attempt to create an exception to Section 154 (see *Lawndale National Bank v. American Casualty Co. of Reading, Pa.,* 489 F.2d 1384, 1388 (7th Cir.1973)). Any further efforts along those lines, such as Insurers', run head on into the recently renewed admonition to "plaintiffs desirous of succeeding on novel state

**9.** More than one writer on good legal drafting has pointed out the evils of using "and/or"—see, e.g., Mellinkoff, *The Language of the Law* 306–10 (1963); cf. Freeman, *The Grammatical Lawyer* 101 (1979). But it is rare to encounter such a graphic and poignant illustration of the mischief of which those weasel words are capable.

**10.** Insurers' proposed allegations of fraud thus add nothing to their Count I claim for rescission.

**11.** In *Economy Fire,* the insurance policy itself attempted to incorporate documents not attached to the policy. That effort failed in light of the clear statutory language. Section 154 would similarly prevent the incorporation of unattached financial statements by an attached application.

law claims to present those claims initially in state court" (*Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam)). As defendants point out, Section 154 already contains express exceptions for marine and transportation insurance. When a statute includes such express exceptions, implied exceptions are excluded. *Weast Construction Co. v. Industrial Commission*, 102 Ill.2d 337, 340, 80 Ill.Dec. 763, 764, 466 N.E.2d 215, 216 (1984). Illinois courts do not apply Section 154 to group insurance, but that is so only because such insurance is subject to separate and specific statutory provisions. *Hofeld v. Nationwide Life Insurance Co.*, 59 Ill.2d 522, 533–34, 322 N.E.2d 454, 460 (1975). Insurers cannot point to a similar statute singling out D & O insurance for different treatment.

Insurers must show compliance with Section 154 when attempting to rescind the Policies. Their attempt at "constructive" compliance in ¶ 47 is rejected, and leave to add ¶ 47 in its present form is denied. Unless Insurers can allege in good faith that the Form Renewal Proposal and Financial Statements—documents containing the alleged misrepresentations they intend to use as a basis for rescission—were physically attached to the Policies, they are also denied leave to add their ¶¶ 40, 42 and 43 allegations (as to incorporation of those documents through custom and practice).

3. *Incorporation*

Even were Insurers able to make the necessary physical-attachment allegation, they would still have to avoid the second prong of defendants' argument. In that respect, defendants initially claim this Court has already rejected Insurers' allegations of custom and practice in the Ninth Opinion and in dealing with Insurers' motion to reconsider. Defendants are wrong. Those allegations were not before this Court when it originally decided defendants' Rule 26(f) motion, and although Insurers argued custom and practice as a basis for reversing the Ninth Opinion, this Court did not then consider the issue (which was not properly before it). Nevertheless the Ninth Opinion still looms large

over Insurers' proposed allegations of custom and practice, and the law applied in that opinion does render some of Insurers' allegations futile.

To invoke any misrepresentations in the Form Renewal Proposal or the Financial Statements as a basis for rescinding the Policies, Insurers must establish (1) those documents were a part of the insurance contract between Insurers and CIC (even beyond the requirement of being physically attached to the Policies) and (2) CIC warranted the accuracy of those documents (the Ninth Opinion, 643 F.Supp. at 1439–41). Both those requirements were found lacking in the Ninth Opinion (*id.*). Insurers' proposed allegations of custom and practice can legally affect only the second, but not the first, of them.

*Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.*, 682 F.2d 12, 17 (1st Cir.1982) (applying Illinois and Ohio law) (citations omitted) summarized the proper approach to construing insurance policies:

> Where the relevant language is unambiguous and the application of the policy to the relevant facts is clear, that intent must be ascertained by the plain and ordinary meaning of the contract language. Where, however, the policy terms are ambiguous and the coverage issue is reasonably disputed, a court may consider extrinsic evidence of the surrounding circumstances and of the parties' intent. For example, evidence of the construction given to the language by the parties and of the customary usage of persons in the same commercial setting is normally admissible. If the meaning of the policy terms remains unclear, the policy is generally construed in favor of the insured in order to promote the policy's objective of providing coverage.

Neither the Harbor Renewal Proposal nor the National Union Application contained any language expressly incorporating any Financial Statements—even if attached as part of CIC's application for D & O insurance. Both documents contained a "representation of truthfulness" in which CIC declared its representations "herein" (Har-

bor) and "in this application" (National Union) to be true (see the Ninth Opinion, 643 F.Supp. at 1438–39). CIC argued those representations of truthfulness applied only to the Proposal or Application itself and not to any attached Financial Statements. Insurers, of course, disagreed.

Because there were no allegations of D & O insurance industry custom and practice before this Court at that time, the Ninth Opinion followed Illinois law and construed any arguable ambiguity in Insurers' own forms against them: CIC's representations of truthfulness applied *only* to CIC's statements in the actual Harbor Renewal Proposal and National Union Application. Insurers now seek to allege (¶ 42) the custom and practice of the D & O insurance industry, known to CIC, is to treat such attached financial statements as incorporated into the insurance application. If proved, that allegation would remove any ambiguity as to the documents to which the "representations of truthfulness" applied. Thus the rule requiring that ambiguities be construed against Insurers would not come into play at all. Insurers should be allowed to plead and prove such allegations to allow these cases to be decided on their merits. *If* Insurers can first allege the Financial Statements were attached to the respective Policies, Insurers are also granted leave to include the ¶ 42 amendment as to custom and practice relating to incorporation of the attached Financial Statements.

But that same analysis does not apply to the Form Renewal Proposal. In the Ninth Opinion, 643 F.Supp. at 1440 this Court held the Harbor Renewal Proposal and National Union Renewal Application expressly and unambiguously excluded the Form Renewal Proposal from being a part of CIC's application and the resulting insurance contract between Insurers and CIC. That poses a special problem as to the place that evidence of custom and usage plays in contract law—a conceptual problem not addressed by the litigants in these terms, and surprisingly not much dealt with by contract cases or treatises.

Extrinsic evidence such as custom and practice can be admitted to explain the meaning of express terms in a contract even when those terms are on their face unambiguous (see, e.g., *Eagle-Picher*, 682 F.2d at 18). That is true because the search for contractual meaning is really one for the intention of the contracting parties (though the law provides a good many gap-fillers and presumptions, in recognition of the general difficulty of divining subjective intention). And, of course, contracting parties are always free to give a word or phrase a meaning different from that in general usage, see 3 *Corbin on Contracts.* § 544 (1960). Nor is that possibility limited to the more fanciful examples posed by Corbin, *id.* at 155: Federal courts often encounter, in the real world of narcotics cases, taped telephone conversations in which (say) "tires" or "long-play records" are used to denote (say) kilos of cocaine.[12] In that sense extrinsic evidence (including that as to custom and usage) can be used to "contradict" the general or common meaning of an express word or phrase in a contract.

But what Insurers want to do here contrasts sharply with such permissible use of extrinsic evidence. They seek to allege (¶ 40) that, pursuant to custom and practices of the D & O insurance industry, the Harbor Renewal Proposal and the National Union Renewal Application were a supplement to and not a substitute for the Form Renewal Proposal. That is an effort to add to the Policies by alleging custom and practice materials that language in those Policies—language Insurers themselves drafted—*expressly* excludes. Extrinsic evidence cannot contradict the express language of a contract in that manner. Though it does not treat with the matter in precisely these terms, *Atlantic Northern Airlines v. Schwimmer*, 12 N.J. 293, 96 A.2d 652, 656 (1953) comes close to the mark:

> Such evidence is adducible only for the purpose of interpreting the writing—not

---

**12.** In one multidefendant narcotics conspiracy case before this Court, defense counsel had the unenviable task of trying to explain away a recorded telephone conversation in which their clients spoke of "three tires—best quality—more than 90% pure."

for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant.

In sum, although evidence of custom and practice can in fact be used to add to a contract terms or provisions that are not dealt with there (3 *Corbin* § 556, at 240), that evidence cannot be used by a party to undo what that party has expressly provided for in the contract. Because the proposed ¶ 40 evidence would flatly contradict the express terms of their own forms, Insurers are denied leave to add any such allegations to their Complaint. Those allegations would be futile even were Insurers able to allege the Form Renewal Proposal was attached to their Policies. *National Fidelity Life Insurance Co. v. Karaganis*, 811 F.2d 357, 363–64 (7th Cir.1987).

### 4. *Allstate/Northbrook and the Form Renewal Proposal*

At this point the Form Renewal Proposal and the Financial Statements attached to it would drop out of these cases except for another proposed allegation by Insurers. Northbrook Excess and Surplus Insurance Company ("Northbrook") [13] did

not require CIC to submit a Northbrook form comparable to the Harbor Renewal Proposal before Northbrook issued its Policy to CIC. Initially Allstate simply alleged (Original H–A ¶ 100, now repeated in H–A ¶ 111):

> Pursuant to an established and ongoing business relationship between Harbor and Northbrook concerning the underwriting of director and officer liability insurance risks, Northbrook provided an additional $10,000,000 of coverage excess of Harbor's $15,000,000 underlying limits.

Under that allegation Allstate would stand in Harbor's shoes as to the effect of the Harbor Renewal Proposal on the Form Renewal Proposal, and the latter document would not be part of Allstate's insurance contract with CIC either.[14]

Harbor-Allstate now essay a totally different factual statement (H–A ¶ 112):

> Plaintiff Northbrook relied upon the [Form Renewal Proposal] and the accompanying documents and defendants' representations made therein and therewith, as well as additional Continental financial information in the public domain, in underwriting and issuing the Policies.

That major shift in position by Allstate is one Insurers have totally failed to address, let alone highlight.[15]

---

**13.** Allstate is Northbrook's successor in interest.

**14.** This Court assumed just that in the Ninth Opinion, because neither side discussed the Northbrook Policy (643 F.Supp. at 1438 n. 6). Defendants claim Original H–A ¶ 100 or H–A ¶ 111 is an admission that Allstate cannot now retract in H–A ¶ 112. This Court addressed a similar argument in *Slate Printing Co. v. Metro Envelope Co.*, 532 F.Supp. 431, 434–36 (N.D.Ill. 1982). Relying on *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir.1981), *Slate Printing* held (532 F.Supp. at 436) (emphasis in original):

> [W]hen [plaintiff], *in a separate action*, engaged in the inconsistent pleading presented here, such inconsistency has become admissible against [plaintiff], but *not* as a "judicial admission," which is conclusive or binding.

Where as here the inconsistent allegations are made in the same action, such inconsistencies may be entirely inadmissible (see *Continental Insurance Co. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir.1971), cited favorably in *Enquip* ). This Court need not now decide that question, for

defendants have argued Insurers' earlier allegation was *binding* on them. It clearly was not.

**15.** Labeling such a change a mere "clarification" is another example of Insurers' questionable tactics in these lawsuits. Insurers originally presented their Amended Complaints (a total of 161 pages) to this Court in bulk, without any indication as to what had been added to or deleted from the Original Complaints. This Court pointed out common courtesy required that opposing counsel and this Court be provided a marked-up copy of the new pleadings, to avoid the tedious job of placing the documents side by side for a word-by-word comparison (indeed, from this Court's experience in the practice of law that is the "custom and practice" of reputable counsel in dealing with successive drafts of negotiated contracts or other complex documents). In response Insurers' counsel provided such an underscored copy. Even then, however, they did not do what candor (as well as courtesy) would demand. They did cryptically refer to their change in position as to Allstate in their Mem. 10 n. 3, but even there they did

If the new allegation is allowed, it could bring the Form Renewal Proposal back into one of these lawsuits—at least as to one plaintiff. Allstate's new position is apparently that the Form Renewal Proposal, and not the Harbor Renewal Proposal, was the CIC offer that Northbrook accepted to form an insurance contract with CIC. Allstate has offered no explanation for its delay in asserting such a dramatic change in position, nor have defendants addressed the implications of such a change if allowed.[16] At the very least that change would further complicate these lawsuits by introducing a third independent insurance contract into the fray.[17]

Of course Allstate (like Harbor and National Union) must first satisfy Section 154. It must be able to allege in good faith that the Form Renewal Proposal and Financial Statements were physically attached to Northbrook's Policy when issued to CIC. If Allstate can and does make that allegation, its H–A ¶ 112 amendment will be conditionally allowed.[18] Because of Allstate's unexcused (and, it would seem clear, inexcusable) delay in asserting its new position, it must bear any incremental costs to defendants caused by that delay.

### 5. *Specific Allegations of Misrepresentation*

Insurers also seek to add several specific allegations of misrepresentation to their Complaints. Because the same standards do not apply across the board, some individualized discussion is called for.

To the extent the proposed allegations by Harbor and National Union point to representations in the Form Renewal Proposal or in the Financial Statements attached to that form (¶¶ 50(d), 51), they are futile and are not allowed—as already held, those documents are not part of the insurance contracts between Harbor and CIC and National Union and CIC. As for Allstate, however, such allegations must be allowed if it properly alleges compliance with Section 154.[19]

▮ National Union also seeks to allege two specific misrepresentations in the National Union Application submitted by CIC. If National Union satisfies the requirements of Section 154 as to its Application, its allegation in ¶ 51 as to CIC's misrepresentations in that form will be allowed. National Union's ¶ 50(e), however, alleges CIC misrepresented its net worth in the Renewal Application by referring "to the financial information previously provided to [National Union]." That "previously provided" financial information refers to the Financial Statements provided by CIC with the Form Renewal Proposal. National Union argues CIC incorporated those documents into its Renewal Application and that form's "representation of truthfulness" by answering "Previously Provided" when the Renewal Application asked for CIC's net worth. That sort of bootstrapping, however, is barred by the same express language in the Renewal Application that prevented incorporation because of custom and practice. National Union cannot thus use documents that were not part of CIC's application as the basis for rescinding CIC's insurance. *National Fidelity,* 811 F.2d at 363–64.

not identify H–A ¶ 112 as the source for their new position. That memorandum footnote is the first time in this entire litigation that Harbor and Allstate's fortunes have not been treated as inextricably linked. Litigants simply should not impose on a court (or, indeed, on their adversaries) the task of ferreting out such a significantly altered position.

**16.** Defendants also devote only one footnote to the question. They mistakenly claim Original H–A ¶ 100 has been deleted from the H–A Amended Complaint. That allegation, however, is repeated verbatim in H–A ¶ 111.

**17.** Until now Allstate has claimed no rights against defendants other than those shared by Harbor. Allstate's new asserted independence would appear to attenuate the logic of Harbor and Allstate joining to file a single complaint.

**18.** True enough, Rule 15(a) does not expressly confer judicial authority for the imposition of conditions on granting leave to amend. But many courts have implied such authority from Rule 15(a)'s broad grant of discretion. See 6 Wright & Miller § 1486.

**19.** That distinction is just the first example of how Allstate's change in position could further complicate these lawsuits.

One final problem remains with Insurers' amended opening factual allegations. In ¶ 39 Insurers propose to refer to the Form Renewal Proposal and the Harbor Renewal Proposal or National Union Application collectively as the "Renewal Proposals." Insurers then proceed to treat those "Renewal Proposals" alike throughout most of the Amended Complaints. That kind of wishful thinking only tends to confuse matters. At best each Insurer had a legal right to rely on only one of those forms when issuing D & O insurance to CIC. Accordingly Insurers are ordered to modify ¶ 39 so that "Renewal Proposals" becomes a term of art, referring to the Form Renewal Proposal as to Allstate, the Harbor Renewal Proposal as to Harbor and the National Union Renewal Application as to National Union.[20]

### Count I

Count I ¶ 109 originally alleged and continues to allege defendants made material misrepresentations and failed to disclose material facts in connection with their 1981 applications for D & O insurance. Insurers now seek "in the alternative" to allege defendants' misrepresentations and omissions were wilful and intentional (¶ 110).[21]

Defendants do not challenge the proposed allegation of intentional misrepresentations. They do argue Insurers cannot allege intentional omissions because defendants had no general duty to reveal to Insurers all material information as to the risks involved in issuing D & O insurance to CIC.

It appears defendants are right under Illinois law as elsewhere (see *Preferred Risk Mutual Insurance Co. v. Hites*, 125 Ill.App.2d 144, 153, 259 N.E.2d 815, 819–20 (3d Dist.1970)). All the same, Insurers will be permitted to add ¶ 110 because Insurers' and defendants' disagreement may be only one of semantics: One litigant's "misrepre-

sentation" may be another's "omission." If defendants gave an incomplete or misleading answer to Insurers' direct questions, that failure could be actionable whether labeled as a misrepresentation or as an omission (see *Hatch v. Woodmen Accident & Life Co.*, 88 Ill.3d 36, 42 Ill. Dec. 925, 409 N.E.2d 540 (2d Dist.1980)).

Defendants also challenge National Union's attempt to add allegations (NU ¶ 111) that defendants breached their duty to inform National Union of changed circumstances between the date defendants submitted the Form Renewal Proposal (July 9, 1981) and the National Union Renewal Application (December 16, 1981). Illinois law does impose a duty on insureds to inform their insurers of changes that cause statements in their application to become untrue before issuance of the policy (see *Western Fire Insurance Co. v. Moss*, 11 Ill.App.3d 802, 812–15, 298 N.E.2d 304, 312–14 (1st Dist.1973)). But for that general principle to apply here, the Form Renewal Proposal would have to be viewed as the "application." As this opinion has already explained, that is just not so. National Union specifically chose to have its own form (the National Union Application) replace the Form Renewal Proposal—and it did so expressly. National Union lost any potential benefit from the *Western Fire* rule by requiring defendants to submit a second application.

### Count IV

Defendants do not really challenge Insurers' addition of custom and practice allegations to Count IV ¶ 130, except to claim they are an attempt to plead evidence. Because those allegations serve to clarify the Count IV claim, they are allowed.

### Count VII

In Count VII Insurers attempt to avoid liability under the Policies because of

---

**20.** With that understanding, Insurers' ¶ 43 allegations become unobjectionable and are allowed—if, of course, Insurers can allege the appropriate documents were actually attached to each Insurer's Policy.

**21.** Count I ¶ 110 also alleges fraud. As already noted, Insurers cannot avoid Section 154 by arguing fraud in the inducement. Allegations of fraud would therefore seem to add nothing to Insurers' Count I claim.

defendants' alleged breach of their contractual duty to cooperate with Insurers in the underlying securities litigation. Insurers now seek to add to Count VII several factual allegations (¶¶ 150, 156, 157 and 161) and another claim for breach of contract (¶ 162, H–A Prayer for Relief (D), NU Prayer for Relief (C)). Although Insurers characterize their new allegations as "amendments," they are really Rule 15(d) supplemental pleadings: They are based on post-Complaint events.

Insurers' supplemental factual allegations are unobjectionable and are allowed. But Insurers' new ¶ 162 claim is much more problematic. It says:

> As a result of defendant's breach of contract, [Insurers] face a counterclaim filed herein by the FDIC seeking recovery from plaintiff in excess of $88 million and a claim by the plaintiff class seeking recovery in the amount of $20 million, and [Insurers] are entitled to recover all amounts paid pursuant to said claims from Continental, the Bank and the individual defendants.

Although that allegation is certainly not so limited in terms, Insurers' Memorandum explains they simply seek to recover, from any defendants *not* covered by the Policies, whatever amounts Insurers *may* be required to pay to defendants who *are* covered by the Policies. Even assuming ¶ 162 were read as stating such a claim, it must fail and is not allowed.

This Court's Tenth Opinion, 646 F.Supp. 746 and Fifteenth Opinion, 652 F.Supp. 867 dismissed similar claims advanced in Original Complaint Count IX for failing to state an actual controversy in Article III terms. Defendants argue Insurers' new claim suffers from the same defect. Insurers rely on FDIC's recently filed counterclaim to cure any Article III problems (see the Eleventh Opinion, 113 F.R.D. 527), but they really do not explain just how that is so. That omission may well have been inten-

tional, because Insurers' claim cannot withstand scrutiny.

Just as this Court said of Insurers' Count IX claims in the Tenth Opinion, 646 F.Supp. at 750:

> Insurers' [proposed] claim against [defendants] is much like one for indemnification, for like an indemnitor [defendants have] at most a contingent obligation (if any at all) to Insurers.

And just as was true there, Insurers must somehow avoid *Cunningham Brothers, Inc. v. Bail,* 407 F.2d 1165, 1169 (7th Cir. 1969), which (*Forty-Eight Insulations, Inc. v. Johns-Manville Products Corp.,* 472 F.Supp. 385, 394 (N.D.Ill.1979)):

> states the general proposition that declaratory relief as to indemnity is unavailable if liability in the underlying action has not been established.

Insurers contend FDIC's $88 million counterclaim enables them to avoid the *Cunningham* principle. They are only partly right.

Insurers propose to obtain a declaration of rights of defendants' liability to them not only on FDIC's counterclaim but also on a potential $20 million claim that is not a part of these actions.[22] FDIC's counterclaim does not affect that second claim. To that extent *Cunningham* controls, and that part of Insurers' proposed claim fails for want of jurisdiction.

Nor can Insurers avoid that result by contending they have a direct claim against defendants for breach of contract. Under Illinois law Insurers cannot recover damages that are contingent or uncertain. *Lind v. Carson,* 16 Ill.App.2d 542, 148 N.E.2d 814 (1st Dist.1958) (abst.). Here Insurers' alleged damages are contingent on their losing these lawsuits *and* on a suit by the holders of the $20 million claim under the Policies. Only then will Insurers have suffered actual, compensable damages.

---

**22.** This Court denied the holders of that claim permission to intervene here (see the Twelfth Opinion, 113 F.R.D. 532). As a result, that claim will no doubt become the subject of a state court lawsuit (unless the unheard-of occurs, and Insurers decide to admit liability on that claim). Under Illinois law any right of Insurers to indemnification will not ripen until they have been found liable in the underlying action. See *Forty-Eight Insulations,* 472 F.Supp. at 393.

As for the other aspect of Insurers' ¶ 162 claim—that based on their potential liability under FDIC's counterclaim—the pendency of that counterclaim averts Article III difficulties. Indeed Rule 14(b) permits a plaintiff against whom a counterclaim is asserted to join (or implead) a third party who is or *may be* liable to plaintiff for all or part of the counterclaim. That provision has the effect of accelerating the time for determining a party's right to indemnity, even though that right is contingent upon the establishment of liability in a pending claim in the main action. *Williams v. Ford Motor Credit Co.*, 627 F.2d 158, 160 (8th Cir.1980); 6 Wright & Miller § 1451.[23]

True enough, Rule 14 literally applies only to contingent claims against "a person not a party to the action." [24] Here Insurers propose an indemnity claim against present parties litigant (certain defendants) because of Insurers' potential liability to another defendant (FDIC). It would seem anomalous not to allow such a claim when Rule 14 would permit a new party to be brought into court on a like claim. Other courts have allowed such claims (see, e.g., *United States f/u/o Westinghouse Electric Supply Co. v. Nicholas*, 28 F.R.D. 8, 10–11 (D.Minn.1961). Such an approach makes sense and fosters the same policies that inform Rule 14.

That, however, does not get Insurers home free. They still have the burden of establishing the existence of a substantive right that could entitle them to the indemnity they claim. 6 Wright & Miller § 1451, at 280. This opinion turns to that final question.

To repeat, Insurers' new theory is one of recovering, from defendants who breached the insurance contract, any amounts Insurers may have to pay out to FDIC under the Policies. Insurers are unable to cite, and this Court is unable to find, a single case or other authority supporting such a theory of liability. Quite the converse is true: Ordinarily an insurer's remedy for an insured's breach of contract is to avoid coverage under the insurance policy, thus avoiding any payout. *Groth v. Standard Accident Insurance Co.*, 267 F.2d 399, 401 (7th Cir. 1959); 8 Appleman, *Insurance Law and Practice* § 4772 (1981 revision).

In fact, *Rock Island Bank v. Aetna Casualty and Surety Co.*, 692 F.2d 1100, 1106–07 (7th Cir.1982) holds an insurer has no independent cause of action for indemnity against the wrongdoer who caused the injury necessitating payment by the insurer to the insured. Any such claim must be based on the insurer's derivative right to subrogation. And under Illinois law an insurer has no right to subrogation against an insured. *Western States Mutual Insurance Co. v. Standard Mutual Insurance Co.*, 26 Ill.App.2d 378, 386–87, 167 N.E.2d 833, 837–38 (2d Dist.1960). See also 6A Appleman § 4055 (1972).

Indeed, the lack of precedent is not the only problem with Insurers' proposed claim. They do not explain how one defendant's breach of the insurance contract could be the proximate cause of Insurers' liability *under the Policies* to a non-breaching defendant. Nor do they explain any basis for holding any defendant liable for

**23.** This is not of course to say a Rule of Civil Procedure can operate to render a non-"controversy" a "controversy" in Article III terms. Instead, it simply demonstrates why the dependency of Insurers' claim on other claims in these lawsuits is not a fatal contingency: Other factors combine to make such contingent claims "appropriate" and "substantial" for present resolution (see *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937)). Because FDIC's counterclaim is now a part of these lawsuits, it poses a live claim here—one as to which judicial efficiency would be served by combining Insurers' original claims, FDIC's claim and Insurers' new claim into one action (see 6 Wright & Miller § 1442, at 202–03). Each of those factors is

absent as to Insurers' seeking indemnity for the potential $20 million claim against them (a claim not in litigation here). In the same way, FDIC's pending counterclaim also distinguishes Insurers' proposed claim from those dismissed for lack of jurisdiction in the Tenth and Fifteenth Opinions. There indemnity was sought for various contingent claims under the Policies—again claims that were not a part of these actions.

**24.** Rule 13(g), which also allows for contingent claims, would also not apply here under its express terms. It is limited to cross-claims against co-parties.

such purely consequential damages. Illinois follows the familiar rule that damages recoverable in a breach of contract action are limited to those reasonably foreseeable and within the contemplation of the parties when the contract was executed. *M.A. Lombard & Son Co. v. Public Building Commission of Chicago,* 101 Ill.App.3d 514, 520, 57 Ill.Dec. 209, 213, 428 N.E.2d 889, 893 (1st Dist.1981). In that respect, the total absence of authority allowing recovery of such damages does double duty: Insurers cannot assert such potential damages were contemplated when Insurers and CIC contracted for insurance coverage.

Insurers are really asking this Court to create an unheard-of new theory for liability under state law. Under the *Erie* regime, that role is for the Illinois state courts, not a federal district court in diversity proceedings. *Shaw,* 810 F.2d at 150. To do what Insurers ask would strain an already-stretched Rule 14 analogy beyond the breaking point.

Insurers can fight matters out on FDIC's counterclaim here. If they are in fact found liable and still believe they can blaze new trails with their indemnity claim, they are free to assert it in a separate lawsuit in state court (see *Forty-Eight Insulations,* 472 F.Supp. at 393). Leave to add ¶ 162 is denied.

### Conclusion

Many of the changes in Insurers' Amended Complaints are minor—some are purely cosmetic. Leave is granted to file those amendments. Leave to file several material amendments is denied because they are insufficient as a matter of law. Leave to file other material amendments is also denied unless Insurers can couple them with a good faith allegations of compliance with Section 154. If Allstate in particular is able so to allege, H-A ¶ 112 too is allowed—but subject to Allstate's paying defendants' incremental expenses incurred and to be incurred because of that inexcusably belated amendment. Leave to file a

new claim under Count VII is denied. Insurers' remaining amendments or supplemental pleadings are allowed.

Insurers must return to the drawing boards to produce a self-contained pleading conforming to this opinion. They are given until May 4, 1987 to do so.[25] Defendants shall answer or otherwise plead on or before May 22, 1987.

---

**25.** As n. 15 suggests, the new version shall be accompanied by a marked-up copy to facilitate comparison by defendants and this Court.